**TRAVELLERS INTERNATIONAL AG, et al., Plaintiffs,**

v.

**TRANS WORLD AIRLINES, INC., Defendant.**

No. 88 Civ. 1484 (RWS).

United States District Court, S.D. New York.

April 20, 1988.

Seward & Kissel, New York City (Eugene P. Souther, of counsel), Lewis & Rice, St. Louis, Mo. (Robert S. Allen, Richard B. Walsh, Jr., of counsel), for plaintiffs.

Bryan, Cave, McPheeters & McRoberts, New York City, and St. Louis, Mo. (George S. Hecker, Thomas E. Wack, Terrence J. O'Toole, Robert J. Dwyer, of counsel), for defendant.

## OPINION

SWEET, District Judge.

The plaintiffs Travellers International A.G. ("Travellers") and Windsor, Inc. ("Windsor") moved for a preliminary injunction under Rule 56, Fed.R.Civ.P. to bar defendant Trans World Airlines, Inc. ("TWA") from terminating the contract of November 26, 1984 between the parties (the "Contract"). Upon the findings and conclusions set forth below, a preliminary injunction will issue granting the relief described below.

The principal protagonists to the dispute underlying this action are Barney Ebsworth ("Ebsworth") the sole shareholder of Windsor, the parent of Travellers, its wholly owned subsidiary, which has provided brochures and tours for TWA's Getaway Program, and Carl C. Icahn ("Icahn") who acquired control of TWA in the fall of 1985

and thereafter became the Chairman of the Board and its Chief Executive officer. These men and their lieutenants in the summer and early fall of 1987 reached an impasse in the relationship between their companies, and this litigation resulted.

As is the case more often than anticipated in vigorously contested commercial disputes, the facts found below are not in as substantial dispute as a five-day hearing would indicate, although certain issues of credibility were presented. What is at issue are the inferences and conclusions to be drawn from the facts and the appropriate course of conduct for these entities until such time as this action can be resolved. The terrain of the conflict includes issues of the propriety of TWA's September 16, 1987 letter of termination of the Contract and the balance of the hardships viewed in the accepted context of *Roso–Lino Beverage Distributors, Inc. v. Coca–Cola Bottling Company of New York*, 749 F.2d 124 (2d Cir.1984) and *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir.1979).

As in other complicated corporate affairs, the shifting sands blown by the winds of change of control resulted in altered positions of the parties over the period of the Contract, all leading to this dispute.

*Prior Proceedings*

Following TWA's September 16, 1987 letter of termination, Travellers filed this action in the Circuit Court for the City of St. Louis on November 4, seeking to enjoin the termination. It was then removed on November 30, 1987 by TWA to the United States District Court for the Eastern District of Missouri. Discovery was commenced, and on December 30, 1987 Travellers moved for preliminary injunctive relief, and on January 22, 1988 TWA moved to dismiss, stay or transfer the action.

On February 29, 1988 TWA's motion to transfer was granted, and on March 4, 1988 the action was filed in this court and assigned to the Honorable Robert J. Ward. Travellers moved by order to show cause for preliminary injunctive relief which was referred to Part I because Judge Ward

was, and still is, engaged in an extended criminal trial. After hearing the parties, it was concluded that it was in the interest of both parties and the travelling public to have a determination which would permit both sides to make their plans for offering tour packages in 1989.

Evidence was adduced at hearings on March 21–24 and March 28 and 29, 1988. Final argument was held on April 7, 1988. Although the record is fulsome, the high level of competence of all counsel has greatly assisted both the presentation of evidence and the deliberations of the court upon which the following findings and conclusions are based.

*Findings of Fact*

Travellers is a Swiss corporation with its principal place of business in London, England. It is the parent of a number of operating companies, including Travellers International U.K. Ltd., Travellers Design (both located in London) and Travellers International Tour Operators, headquartered in New York City. Since August 31, 1986, Travellers has been wholly-owned by Windsor, a Missouri corporation with its principal place of business in St. Louis County, Missouri. Ebsworth is Windsor's sole shareholder. He started in the travel business as an agent in 1959 and achieved considerable success in promoting and conducting tours and cruises.

TWA is a Delaware corporation with its principal place of business in New York City. Icahn acquired control of TWA in the fall of 1985 and has thereafter been Chairman of its Board and Chief Executive Officer. He has conducted a number of contests for corporate control to his profit, and TWA is the second New York Stock Exchange Company of which he has become the Chief Operating Officer.

TWA commenced its "Getaway" tour program to Europe in the early 1970's by offering air transportation to passengers purchasing conducted tour packages. TWA owns the Getaway mark. In 1974, TWA entered into the first of a series of written agreements with Travellers, pursuant to which Travellers was responsible for

the preparation of various tour brochures and for the operation of the tours themselves. The tours were sold to the public by independent travel agents who were compensated by TWA. The travel agents utilized the brochures as a selling device. TWA established the airfares, retained the air revenues, and provided the trans-Atlantic air transportation for the passengers. TWA also marketed the tours and accepted reservations through its special Getaway facility in Philadelphia.

The parties met annually early in the year in a planning meeting to discuss the tours to be offered for the succeeding calendar year, the number and content of the tours, and the format, content, design, and number of brochures. Representatives of TWA and Travellers determined the retail price for the land tours for the succeeding calendar year by September 1 of the prior year.

Upon remittance by the customer, TWA paid a standard commission to the travel agent (approximately 14% of the land price), retained a "margin," and remitted the balance to Travellers. For a number of years prior to the controversy giving rise to this action, TWA's margin for the land tours was established, as a matter of practice and not contract, at 6% of the land tour price. Travellers received the remaining 80%.

Since 1971 Travellers provided tours for Cunard Lines which used British Airways to return its passengers to the United States. Since 1976 it also supplied Viking Vacations, tours in Scandinavia, using SAS connections to and from the United States. In 1985 TWA initiated flights from New York to Copenhagen with a stop in London and in 1987 non-stop flights from New York to Scandinavia at a time when SAS had non-stop flights from Los Angeles, Chicago, and Seattle as well as New York.

On November 26, 1984, TWA and Travellers entered into the Contract relating to the tours and tour brochures for a five-year period commencing January 1, 1986 (as to brochures) and January 1, 1987 (as to tours). At the time of this agreement, Travellers was wholly owned by Gerald Herrod ("Herrod"), its founder and chairman. Under the Contract Travellers was to advise TWA on marketing, advertising, development of new tour products, preparation of promotional budgets, projection of expenses and revenues and production and distribution of brochures. The parties were also required annually to reach agreement on the tour itineraries and the price and quality of tour packages. The Contract, like its predecessors, did not specify any dollar amounts or percentages for the allocation of tour revenues between Travellers and TWA.

Paragraph 4 of the agreement is the only provision that addresses pricing of the land tours. It states:

TI agrees that the prices charged TWA for the Land Arrangement package for the tours will be competitive with the prices other tour operators charge for land or land/sea arrangement packages similar, in terms of tour elements and quality to the corresponding Land Arrangement packages of TI. The term "price" as used with reference to the land or land/sea arrangement packages of other operators shall mean, in the case of an operator who does not wholesale, the price charged by such operator to an independent wholesaler and, in the case of an operator who does wholesale, the amount collected by retail agents on account of the land or land/sea arrangement package, less a sum representing the customary wholesale mark-up that would have been applied to such package by an independent wholesaler. Unless prohibited by IATA resolutions or applicable laws and regulations, TWA, as wholesaler of the Tours, shall pay travel agent commissions on the Land Arrangements included in the Tours.

Paragraph 5 of the agreement provides that TWA will "wholesale the Tours to travel agents and make retail sales of the Tours at TWA's own sales office or through other distribution channels as deemed appropriate by TWA" and will:

produce and distribute brochures for the Tours in such numbers as are deemed appropriate to produce the number of

Tour passengers desired by TWA and TI, such desired number of Tour passengers to be mutually agreed upon for each year by TWA and TI, but in no event to be less than 100,000 per year.

Section D of the Contract provided, as set forth below, an exclusivity provision with respect to Travellers' duties:

1. Neither TI nor any of its affiliates will, except with TWA's prior written consent (not to be unreasonably withheld) in each specific instance, directly or indirectly (i) operate land or land/sea arrangements of any tours other than the Tours (ii) engage in the wholesaling of tours or (iii) provide to any third party any consulting or other services relating to the operating, wholesaling or promotion of tours; provided, however, that the foregoing restrictions shall not apply (aa) in the case of tours which do not involve the United States to the Europe, Israel or Egypt tour market, nor (bb) with respect to tours which would not substantially compete with any of the Tours or any of TWA's proprietary tours, nor (cc) with respect to any charter tour program operated by TI or any of TI's affiliate companies for which TWA either provides the transatlantic charter air transportation or has declined to provide the same at charter prices competitive with those of other air carriers, nor (dd) with respect to the operation of air tours to be marketed by TI to persons residing in a regional area of the U.S.A. where TWA does not offer non-stop transatlantic service, which are scheduled to depart from the same region between April 1 and October 31 of each year, and which include transatlantic non-stop air transportation from the same region on a specific other scheduled carrier.

Section F of the Contract contains the provisions for termination:

1. This Agreement may be terminated by TWA in whole or in part (as to the Tours alone or Tour Brochures alone) at any time during the term hereof upon written notice to TI as hereinafter provided, if (i) TI does not perform all of the services described in clauses (i) and (ii) of Paragraph 1 hereof with the same high quality pursuant to the Current Tour Agreement; or (ii) the Land Arrangements do not achieve the same high level of customer satisfaction as with the Current Tour Agreement; or (iii) TI does not provide TWA with the information set forth in Paragraph A.3. by the applicable dates therein provided or TI fails to perform any of its other obligations hereunder and does not cure said failure within 30 days after written notice thereof from TWA; or (iv) the Tour Brochures do not have a marketing impact on potential customers for the Tours which is at least equal to the marketing impact of the Getaway USA to Europe tour brochures produced from 1980–1984 (excluding Fly/Drive tours and non-group tours); or (v) TI fails to provide TWA with the materials referred to in above Paragraph B.5. by the applicable dates therein provided; or (vi) if during any consecutive twelve month period, a substantial portion of the then key management team of TI and its related companies involved in activities related to the performance of this Agreement leaves or is otherwise no longer available to plan and supervise such activities. TI shall be free to terminate this Agreement upon written notice to TWA, as hereinafter provided, if TWA fails to perform any of its obligations hereunder and does not cure said failure within 30 days after written notice thereof from TI. Any termination notice given by TWA or TI pursuant to this Paragraph F.1. shall, if given by March 1 of any year, be effective as to Tours as of the end of that year or, if given after March 1 of any year, be effective as to Tours as of the end of the next year; and if given by March 1 of any year, shall be effective as to Tour Brochures upon the delivery to TWA of the final edition of the Tour Brochures for that year, or, if given after March 1 of any year, shall be effective as to Tour Brochures upon the delivery to TWA of the final edition of the Tour Brochures for the next year. Notwithstanding the giving of such termination notice, each party shall continue

to perform its respective obligations hereunder up to the effective termination date. Any termination by either party under this Paragraph which is based on the other party's failure to perform its obligations hereunder shall not preclude the terminating party from pursuing a claim for damages or enforcing any other rights or remedies available to it by virtue of the other party's failure to perform its obligations.

2. This agreement may be terminated by TI (i) as to Tours at any time upon not less than 18 months prior written notice in the event TI determines (and all of its affiliated companies likewise determine) to cease engaging in the operation of land and land/sea arrangements for tours or (ii) as to Tour Brochures at any time upon not less than 18 months prior notice in the event TI determines (and all of its affiliated companies likewise determine) to cease engaging in the creation and production of tour brochures. This Agreement may be terminated by TWA at any time upon not less than 18 months prior written notice in the event TWA determines not to continue with proprietary tour programs for the U.S.A. to Europe transatlantic tour market or to have only proprietary Fly/Drive or non-group programs for such market.

Under the Contract, in 1985 some 160,000 passengers had purchased Getaway tours at an average price of $1,000 each. Starting on June 13, 1985, when a TWA aircraft was hijacked, acts of terrorism, including airport bombings, the *Achille Lauro* seizure, the explosion of an Air India aircraft, culminating in the April 1986 raid on Libya, all dampened international tourism. The Chernobyl disaster in the spring of 1986 had a similar effect, and in 1986 TWA marketed only 40,000 Getaway tours.

After taking control of TWA in 1985, Icahn set about reducing costs seeking to turn the company's prior losses around. Early in 1986 he hired Morton Ehrlich ("Ehrlich") as Executive Vice President in charge of Marketing, Planning and Governmental Affairs. Ehrlich had previously been a Senior Vice President at Eastern Airlines. During 1986 Icahn and Ehrlich were concerned with gaining executive control over TWA, which in Icahn's view had been badly managed, dealing with a strike of flight attendants, refinancing, and strengthening TWA's domestic position by the acquisition of Ozark Airlines.

Commencing in early 1986, Herrod began efforts to sell Travellers and a price of about $21 million was suggested. In describing Travellers, Herrod, in an April 1 letter to Peter McHugh ("McHugh"), Senior Vice President of TWA, suggested that TWA should acquire Travellers "and thereby establish a new in-house subsidiary and independent profit center that could expand geographically and otherwise." He described Travellers as follows:

Essentially, Travellers encompasses a group of about 15 affiliated companies in various countries in Europe and in the United States. The main company was founded in 1963. Head office is in Basel, Switzerland. Principal business is tour operating and design and production of tour brochures and collateral materials. Offices are maintained in New York, London (3) Athens, Rome, Madrid, Torremolinos, Venice, Dublin, Manchester plus "joint venture" offices in Paris, Copenhagen, Cairo and Tel Aviv. We have approximately 250 full time employees and 500 part time. Travellers is privately owned, has no outstanding loans, and more details of the company structure would of course be provided if there was serious interest.

Principal source of business is TWA Getaway, SAS Viking Vacations, Cunard Line plus Travellers own charter and special group business. Total sales in 1985 exceeded $150 million. The company is recognized as No. 1 for Americans in Europe both for quality and size. Travellers enjoys an unusual credit standing with suppliers negating the need for advance payments thereby creating substantial profit on cash flow. Quality of middle and top management is excellent. The group has shown steadily advancing profits since the first year of incorporation.

McHugh recommended the purchase from Herrod to Ehrlich and Icahn who had no interest in the acquisition. McHugh advised Herrod, who then turned to other possible purchasers including Ebsworth with whom he reached an understanding on June 6, 1986.

Windsor agreed over time to pay several million for the fixed assets of Travellers, more for its intangible assets (including the TWA Getaway contract) and certain royalties in the event designated Getaway passengers levels were met.[1] The same day, June 6, Ebsworth wrote to McHugh expressing enthusiasm for the future and his pleasure at meeting Timothy Brier ("Brier"), a marketing Vice President of TWA, and McHugh. Ebsworth kept McHugh advised of the developments and by letter of August 6, 1986 McHugh, acknowledging the purchase by Windsor, stated:

> As long as you intend to perform according to the terms and conditions of our existing contract with Travellers International, TWA agrees to your purchase of the business.

Prior to the sale of Travellers to Windsor, Herrod, its Chairman, Robert Iversen ("Iversen"), its President, David Yellow ("Yellow"), the Director of Product Development and Debbie Natansohn ("Natansohn"), the Creative Director, were among the Travellers employees who participated in the planning meetings.

By letter of August 21, 1986, Ebsworth advised TWA that he was interviewing candidates to replace Iversen. TWA recommended Malcolm Speed ("Speed") a former TWA executive whom Ebsworth hired to head Travellers' New York office.

Adolph Dettling ("Dettling") was Chief Financial Officer of Travellers based in Switzerland while the company was owned by Herrod. He remains a director of Travellers. Dettling handled Herrod's investments and managed Travellers' internal financial affairs but was not directly involved in the performance of the Contract.

Yellow was involved with others in making tour arrangements, but one-half of his activities in the years immediately preceding the sale of Travellers, were in connection with Herrod's Ocean Cruise Lines operation.

Natansohn's duties were primarily that of a writer who assisted in the preparation of the brochures, and, like Yellow, she spent more than half of her time working for Ocean Cruise Lines prior to the sale. At the time of the acquisition, Travellers had at least 23 officers, directors and managers who were members of its management team, twenty of whom have remained with Travellers.

By letter of September 18, 1986 Craig Pavlus ("Pavlus"), TWA's Vice–President of Sales and Reservations, wrote Ebsworth to express enthusiasm for the future and "working very closely with your new staff on better ways to merchandise Getaway to consumers."

Although TWA officers expressed views about the performance of the Contract which differed from those held by Travellers employees, no oral or written complaint was made to Travellers about the performance of key personnel under the Contract until September 1987. There was no internal TWA written communication on the subject until the summer of 1987.

Commencing in late 1986 and continuing into 1987, Pavlus began to scrutinize the operating costs associated with the Getaway program and concluded that TWA's former internal accounting for the program had made certain assumptions as to incremental income for which no empirical evidence could be located. At Ehrlich's direction, in March of 1987, Pavlus took control of the entire TWA Getaway program, assuming the sales responsibilities which had formerly been performed by Brier as Vice–President of Passenger Marketing.

In late 1986 Ehrlich began a review of the brochure program provided under the Contract and began consideration of the profitability of the Getaway program. In the course of review, an internal TWA memorandum indicated that the program

---

1. The actual figures, known to the court, have to date been held in confidence, for counsel's use only, given the negotiations which followed as recounted below.

had provided incremental revenues of over $49 million for 1985, incremental revenue being the revenues received by TWA as a result of the tours which otherwise would not have been achieved.

Sheldon Kravitz ("Kravitz") submitted a report to Icahn on February 11, 1987 "just to whet your appetite—my good buddy." According to Kravitz, TWA was being charged "exorbitant fees" by Travellers, including excessive cost for printing despite the submission to TWA of the bids received by Travellers for printing the brochures. Kravitz also suggested misappropriation by TWA personnel. Pavlus received an internal memo of April 3, 1987 which consisted of "documents/scenarios which briefly detail the TWA Getaway Program history and components." Included was the statement that the 1985 Getaway program included a profit contribution of $87.3 million. An April 17, 1987 report was also prepared by the Manager of Tour Marketing in response to Kravitz' charges which Pavlus concluded were unfounded.

In the spring of 1987 Ebsworth, spotting Joe Corr ("Corr"), the President of TWA, at his lunch club in St. Louis, suggested to Brier that he would like to meet Corr. After checking with Ehrlich, the suggestion was made that Ehrlich, who reported to Corr, would like to meet Ebsworth. This message was received by Ebsworth as an indication that he should not go beyond Ehrlich in his dealings with TWA.

A meeting was arranged in May with Ehrlich and Brier for TWA and Ebsworth and Speed for Travellers. It was not the social or corporate success that Ebsworth had hoped for. The costs for producing the brochures under the Contract were discussed, and the TWA officers took the position, reflected in their April 17 internal document on the subject, "that TWA's cost will be reduced on brochure production or that the entire contract would be *ripped up*." (emphasis in original).

In discussions following the lunch through Speed and Pavlus the Contract provisions relating to the production of brochures were renegotiated in a meeting in London in mid May, Speed having stated

that the brochure production did not constitute a profit center for Travellers. Reproduction page costs were reduced from $650 to $450 and a 5% fee for supervising printing was reduced to a flat amount of $65,-000. TWA arranged with Travellers to produce the brochures for its 1987 and 1988 Getaway tours to Hawaii and the Caribbean though these brochures were outside the ambit of the Contract. There is no evidence that any of the Travellers brochures lacked marketing impact. Indeed, some observers, including some at TWA, believed the brochures to be the best in the business.

In addition to discussion about brochure costs, the questions of margins was raised at the Ehrlich–Ebsworth spring meeting, margin being understood to be the percentage of the retail price of a tour which was payable to the travel agents and to TWA. Until the spring of 1987 those amounts had traditionally been 14% and 6%. It was Ebsworth's position that any increase in those margins would have a harmful competitive effect on retail sales.

After a number of discussions, by July Speed and Pavlus had agreed to a margin increase of 1%, a negotiating process which brought Travellers to Icahn's attention when Pavlus sought his authority for an $8 increase. Icahn reached the conclusion without documentation that the brochure costs under the contract were "a rip-off," that the margins were inadequate, and that TWA was incurring losses to sell its tour seats which more than offset the claimed incremental revenues. Icahn set up a late afternoon meeting at his office with Ebsworth which took place on August 5, 1987, which was followed by a dinner attended also by Ehrlich, Pavlus and Speed. Each participant testified about the conversations with somewhat different recollections colored by the emotions aroused by the event. However, the topics covered, and the tone of the conversations emerge quite sharply from the testimony. The meetings were even more of a social and professional disaster than the earlier Ehrlich/Ebsworth encounter.

Initially Ebsworth and Icahn met alone in the latter's office. After some small talk, Icahn stated his unhappiness with the relationship between Travellers and TWA, citing the brochure costs, the difficulties Pavlus and Ehrlich were having dealing with Travellers, and his determination that Travellers was not going to make a profit at the expense of TWA. Ebsworth rejoined somewhat in kind by suggesting that Ehrlich did not understand the tour business and that his ignorance was the source of any misunderstanding.

Icahn pointed out that TWA was Travellers' only customer, that Travellers was, therefore, vulnerable, and that Ebsworth had made a bad mistake in not calling Icahn prior to his purchase of Travellers. Ebsworth countered with his account of the meeting with Ehrlich on the subject of communication with TWA.

Icahn then suggested the relationship be resolved by TWA's purchase of Travellers for the price that Ebsworth paid for it. Ebsworth pointed out the sale had taken place during the period when the industry had been affected by the terrorist attacks and declined to reveal the price paid to Herrod or the details of the transaction which took place in Switzerland.

At dinner Ebsworth and Icahn were joined by Speed, Ehrlich and Pavlus. The conversation started with Ehrlich's rebuttal of Ebsworth's denial of access claim and proceeded downhill, accelerated no doubt by the presence of loyal lieutenants, food and drink. The strong words in loud tones caused complaints from nearby diners, and demands were stated for an increase in the TWA margin to 3%, a better deal for TWA, and an offer by Icahn to tear up the Contract on a handshake, an offer which was refused by Ebsworth. The purchase of Travellers by TWA was again raised by Icahn. Neither Pavlus nor Ehrlich had any prior knowledge of the proposal. Ebsworth again resisted the proposals advanced by Icahn. The words "stupid" and "Hitler tactics" were used, and the participants parted without resolution and in anger.

At the curb, Icahn directed Pavlus and Ehrlich to look into terminating the Contract and developing an in-house tour capacity. At the hearing Icahn testified as to his feeling then and throughout that Travellers was benefitting at TWA's expense and that "Ebsworth did not marry my daughter."

Following the meeting, Speed and Ehrlich reached agreement on a 3% margin which was increased another point by September 15, 1987 when the tour prices had to be finalized, thus increasing TWA's margin from 6% to 10%.

On August 20, 1987, a TWA official made a pointed inquiry about Travellers' contract with SAS and was advised about the renewal of the Contract on July 20, 1987. On September 1, 1987, Icahn asserted to Speed that Travellers doing business with SAS was a breach of the agreement. The next day, September 2, 1987, Travellers terminated its agreement with SAS. Travellers confirmed the cancellation by letter dated September 11, 1987.

Positions had hardened, and although Speed made an attempt to bridge the Rubicon with Pavlus, particularly suggesting further negotiations for purchase, each side sought to strengthen both its economic and legal positions. Ebsworth on September 9, 1987, wrote a letter to the Chairman and Chief Executive Officer of American Airlines requesting a meeting "to explore the possibility that Travellers may be able to greatly assist you in expanding your European business."

On September 16, 1987, Pavlus sent Travellers a letter to terminate the Contract which had been approved by Ehrlich and the TWA legal department. The letter stated that the termination would be "effective December 31, 1988 with respect to Tours and as of December 31, 1987 with respect to Tour Brochures" and set forth six grounds for the termination:

(1) The departure of a substantial portion of the key management team of T.I. and its related companies as provided in paragraph F(1)(vi).

(2) Failure of the Tour brochures to have a marketing impact on potential cus-

tomers for the Tours which is at least equal to the marketing impact of the Getaway USA to Europe tour brochures produced from 1980–1984 as provided in paragraph F(1)(iv).

(3) Operation by T.I. and/or its affiliates of land/sea arrangement of tours other than for TWA and the provision to a third party of consulting or other service relating to the operating, wholesaling, and promotion of tours in violation of the provisions of paragraph D(1) and therefore paragraph F(1)(iii). We refer specifically to your activities in conjunction with SAS.

(4) Your provision of TWA's artwork, graphics, slogans, trademarks, service marks, and creative concepts to SAS in connection with its tour operations in violation of the provisions of paragraph D(2) and therefore paragraph F(1)(iii).

(5) Violation of T.I.'s undertaking to maximize the identity of the tours with TWA in the minds of both the tour passengers and the suppliers of hotel accommodations and other elements of the land arrangements, specifically by copying the concept and the style of the tour brochures in promotional material designed for SAS in violation of the provisions of A(2)(ii) and therefore paragraph F(1)(iii).

(6) Failure to indemnify TWA from and against all liabilities, damages, penalties, claims, actions and proceedings arising out of the land arrangement or arising out of T.I.'s activities in connection with the functions and services provided by T.I. under the agreement in violation of paragraph F(1)(iii). Moreover, such failure has resulted in serious damage to TWA's reputation with default judgments having been entered against TWA in at least the states of New York, New Jersey, California and Ohio because of T.I.'s willful failure to satisfy its indemnification obligations.

Ebsworth continued to seek to interest American Airlines, which in 1987 had 5,000 European tours, in the purchase of Travellers or in an ongoing relationship. Ebsworth also contacted British Airways. No commitments were made. Travellers also initiated this action on November 4 in the Circuit Court of the City of St. Louis. TWA initiated litigation in London with respect to Travellers' use of photographs in the brochures prepared for SAS.

TWA set about to create an in-house tour program, created a Delaware shell corporation for that purpose on December 2, 1987, advertised for travel executives in the London papers, contacting some of Travellers employees, and reached an agreement in principle with John Casulli ("Casulli") to be the managing director of the TWA Getaway program although no contract of employment has yet been signed. Casulli is a former Travellers employee who then represented Travellers in Greece having set up his own office.

On December 7, 1987, TWA sent a telex to approximately 180 hotels in Europe that were under contract with Travellers to provide hotel accommodations for the Getaway tour passengers. The telex advised the hotels that Travellers had breached its contract with TWA, a communication that has complicated Travellers' relationship with those hotels with respect to the 1988 tours. Travellers is now providing the tours for 1988 and the parties are working together in providing proper tours to the Getaway passengers. Business is up 12%.

The Contract provides that by March 15 Travellers is to advise TWA of each of the land arrangements packages prepared by Travellers for the next year. Traditionally, the parties met in February or early March and Travellers presented to TWA its proposed tours and brochures for the following year. On March 2, 1988, Travellers sent TWA a telex requesting such a meeting to plan and provide the 1989 tours and brochures. TWA did not respond.

At the end of February 1988, Travellers had 194 employees, including the 20 key management employees referred to above. In 1987 Travellers' expenses for 10 months, as shown on its 10–month 1987 budget, were more than $7,768,688 and over 77,000

passengers took Getaway tours. TWA has estimated that in 1988, with Travellers providing the European tours and utilizing the 1988 brochures that Travellers produced, TWA will make a pretax profit of $5.1 million from its Getaway program. In 1988 it projects air revenue from Getaway at $88.5 million with $66.7 million incremental revenue because of the tours. Approximately 90–95% of Travellers' business is with TWA.

These facts establish that an unjustified termination of the Contract will destroy Travellers' unique business. Its staff and organization are not easily duplicated, as TWA had discovered, and it is presently virtually completely dependent on TWA for its revenue.

While Travellers has set up an account representing the value of the Contract acquired by the purchase from Herrod on its books, that amount does not represent the going concern value of the company. The asset value of the Contract does not constitute a reparable damage in the event of Travellers' destruction.

As set forth above, TWA's investment in its in-house Getaway program has been minimal. Any damage suffered during the continuation of the Contract is readily calculable and can be redressed by an appropriate award in the event that its termination is later held to have been justified.

## Conclusions of Law

### The Standard for Granting a Preliminary Injunction

Preliminary injunctive relief will be granted only upon "a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Roso–Lino Beverage Distributors v. Coca–Cola Bottling Co.*, 749 F.2d 124, 125 (2d Cir.1984) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979)). Travellers has made such a showing and thus a preliminary injunction will issue.

### Irreparable Injury

■ Cases in this Circuit and elsewhere establish that loss of a business constitutes irreparable injury and thus is not compensable by a damage award. *See e.g., Roso Lino Beverage, supra,* 749 F.2d at 125–26; *Semmes Motors Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2d Cir.1970). Moreover, even if an entire business is not destroyed, the loss of goodwill resulting from the termination of an entire product line is often immeasurable and significant. *Interphoto Corp. v. Minolta Corp.,* 417 F.2d 621, 622 (2d Cir.1969); *see John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.,* 588 F.2d 24, 29 (2d Cir.1978).

The facts just found establish just such irreparable injury—the destruction of Travellers' business and the potential loss of goodwill through the termination of an entire product line.

TWA has persuasively argued that Ebsworth for a period in the fall of 1987 sought to use the TWA termination plus the filing of this litigation as levers to accomplish a purchase of Travellers by TWA or others, an endeavor which was not successful. When the TWA ads appeared in London seeking to hire qualified employees, Ebsworth realized that even to accomplish a sale he had to seek to enforce the Contract and that its termination would end 95% of the business of his company.

The evidence has also established that Travellers has no viable alternative to the TWA business. Even if it did enter into a relationship with American, there is no evidence that such a combination would be an adequate substitute for the current relationship with TWA.

### Substantial Questions Going to the Merits

■ If a contract termination such as this results in an imbalance of hardships, Travellers need not show a likelihood of success but need only raise substantial questions going to the merits of the case. *Semmis Motors, Inc., supra,* 429 F.2d at 1205.

■ The cure provision of the Contract (Paragraph F(1)(iii)) and the Septem-

ber 2, 1987 cancellation of the SAS/Travellers relationship removes Travellers' connection with Viking Tours as a ground for cancellation. In addition, given the "substantially similar" language of the Contract, there may even be a question as to the existence of a breach arising out of Viking Tours' business prior to the summer of 1987 given TWA's previous flight schedule. The silence of Speed and Ebsworth at the March 1987 planning meeting when advised of TWA's intended Scandinavian expansion was less than commendable but did not constitute a contract breach.

However, substantial issues have been presented by the key personnel provision. Whether the employees at issue were key (there's a substantial basis for concluding they were not), and whether the Contract language "related to the performance of this Agreement" modified "the key management team" or "of TI and its related companies" are substantial issues. Absent the clarity which might have been shed by punctuation, it appears that the clause modifies both "team" and "companies" and thereby restricts the number of employees involved. Two additional, substantial and related issues remain with respect to TWA's invocation of the key personnel issue: whether or not the departure of the personnel in question was acknowledged and waived by TWA in 1986 and in early 1987, and whether or not the invocation of the key management provision was invoked pretextually on September 16, 1987.

No meaningful proof was submitted to establish that the brochures had less marketing impact than those for the period of 1980–84, nor that Travellers failed to insure or indemnify TWA as required under the Contract. Indeed, the inclusion of these insupportable grounds lend strength to Travellers charge of pretext.

In an exercise of candor and reality, TWA has urged, appropriately, that the driving force for the termination was the economic effect of the Contract as perceived by Icahn, the "rip-off" by Ebsworth who had not become a family member. Regrettably for TWA, however, even as-suming the effect was as believed by Icahn, Travellers' profit does not provide a ground for contract termination. It may, of course, provide an extra litigation basis for a modification of the terms of the Contract, one which the parties have not to date been able to achieve.

*Balance of Hardship*

The facts have established that the balance of hardship swings strongly in Travellers favor—at least, for the period to be covered by the relief to be granted.

Although TWA claims that it stands to lose $4 million in profits by continuing its business with Travellers—a projected amount only—this figure weighs lightly against the total loss of a going concern. Whereas TWA does considerable business exclusive of its relationship with Travellers, Travellers does little or no business exclusive of its relationship with TWA. Thus Travellers stands to lose more from the loss of the contract than TWA stands to lose from its continuation. *See Roso–Lino, supra,* 749 F.2d at 126; *Ryko Manufacturing Co. v. Eden Services,* 759 F.2d 671, 673 (8th Cir.1985).

Moreover, TWA will suffer minimally by virtue of the relatively short period of time that this relief covers. *See Interphoto Corp., supra,* 417 F.2d at 622. The injunction granted here will remain in effect only until a decision on the merits can be rendered, and in no event will the parties be required to cooperate for more than the term of the Contract, which is due to expire in less than three years.

*Relief Granted*

The central pivot on which this motion turns is the timetable and the need to plan at least fifteen months ahead in order to provide and price tour packages which include space, guides and ground transportation. The unrebutted evidence has established that this process must commence forthwith in order to provide such a product for the summer of 1989, whichever party operates the tours. At this moment, only Travellers has such a capacity.

In addition, by the early spring of 1989 it may well be possible to dispose of this

**1218**

action on the merits since discovery is apparently complete, and little, if anything, should be required to supplement the existing record. In the event that for some reason it is not possible to resolve the action, a further application to extend or to vacate the relief here granted might be appropriate.

With these time factors in mind, the termination by TWA of the Contract will be enjoined until March 1, 1989 or the entry of a judgment disposing of the action, whichever event first occurs. During this period, unless the parties agree otherwise, the past practices and schedules will remain in effect, the wholesale prices will be set by Travellers, the margins will be set by TWA, and, in the event of a disagreement in September, 1988, the pricing grid for the preceding year will be used. The currency adjustment will be shared as it was this year, and the number of the brochures will be determined by TWA at the prices set forth in the Contract modified by the agreement between the parties set forth above.

No proof has been advanced as to the damage to be suffered by TWA in the event that this preliminary injunction is vacated, set aside or reversed. Indeed, no specific figures as to TWA's damages resulting from Travellers' conduct have been adduced. The expenses arising out of the effort to go "in-house," however, can be quantified, and preliminarily a bond in the amount of $750,000 will be required with leave granted both parties to seek modification of that amount on an appropriate showing.

Settle order on notice.

IT IS SO ORDERED.