**PDL VITARI CORP., Plaintiff,**

**v.**

**OLYMPUS INDUSTRIES, INC., Defendant.**

**No. 89 Civ. 4034 (SWK).**

United States District Court, S.D. New York.

Aug. 2, 1989.

Cutner & Rathkopf by David A. Cutner, New York City, for plaintiff.

Condon & Forsyth by Stephen J. Fearon, Edward G. Petraglia, James A. McDevitt, New York City, Reed & Giesa, Spokane, Wash., for defendant.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

Plaintiff filed this complaint for preliminary and permanent injunctive relief, claiming that defendant had breached an exclusive distributorship agreement. Plaintiff applied for a temporary restraining order, with notice to defendant, on June 13, 1989. The hearing was continued until June 16, 1989, at which time counsel argued the application, which the Court denied. Plaintiff seeks an order pursuant to Fed.R. Civ.P. 65(b) restraining and enjoining defendant from (1) selling, transferring, or granting any patent or trademark rights or licenses, or any distribution rights, or (2) entering into any contract or agreement, if such would disavow, cancel, diminish, or interfere in any way with plaintiff's exclusive right to distribute "Vitari Frozen Fruit Dessert" in hard pack form in the states of New York, New Jersey and Connecticut, or from destroying any bulk hard pack mix currently in production to fill plaintiff's orders. On June 29 and 30, 1989, the Court held an evidentiary hearing on the application for a preliminary injunction. The following constitutes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

## FACTUAL BACKGROUND

These facts are based on the verified pleadings, the affidavits and attached exhibits, the testimony of witnesses and the exhibits entered into evidence. Plaintiff PDL Vitari Corp. ("PDL Vitari") is a corporation incorporated on May 31, 1989 in the state of New York to act as exclusive distributor in the states of New York, New Jersey and Connecticut of a hard pack[1] dessert product known as "Vitari Frozen Fruit Dessert" (the "product"). Defendant Olympus Industries Inc. ("Olympus") is incorporated in the state of Washington. Among other things, Olympus manufactures and distributes a bulk mix used to process the hard pack Vitari frozen dessert. Olympus holds patents and trademarks for "Vitari Frozen Fruit Dessert" in the three forms of soft serve, dip and hard pack. Olympus also holds the trademark to the name Vitari.

The principals of plaintiff, Frank Davenport, Sheldon Liss and James Pascale, met in early April, 1989 to discuss the possibility of a new venture selling hard pack Vitari frozen dessert. Affidavit of James Pascale, dated June 12, 1989 ("Pascale Aff."), at ¶ 4. As a result of discussions with Bob Capria, the Eastern Regional Sales Manager for Olympus, the principals met with John Curnow, Olympus's vice-president for marketing, and Capria on April 27, 1989 at plaintiff's offices in Orangeburg, New York. At this meeting, the parties discussed a number of issues, including initial prices, use of artwork and packaging, plaintiff's desire to use the Vitari name, and plaintiff's request to be the exclusive New York area distributor. Letter from Pascale to Curnow, dated May 2, 1989, attached as exhibit A to Pascale Aff. Curnow indicated that Olympus was distributing hard pack in Canada, that he would send a copy of the Canadian contract to be used as a model for a written agreement between plaintiff and defendant;

1. The phrase "hard pack" refers to the state of the dessert product when it reaches consumers, and distinguishes this product from "soft-serve" dessert products.

Curnow expressed enthusiasm for plaintiff's desire to have the product available to consumers in the tri-state area by early July, 1989. Curnow also stated that he would supply the artwork used for pint containers in Canada and would put plaintiff in touch with the Fort Howard Paper Company ("Fort Howard"), which supplies the pint containers for retail sale of Vitari hard pack. Pascale Aff. at ¶ 5.

On May 3, 1989, Curnow sent to plaintiff a copy of the Canadian agreement with the name "Pascale Enterprises, Inc." listed as the contracting party. Exhibit B to Pascale Aff. He also sent a copy of a letter from Fort Howard to Olympus concerning production of the containers. Exhibit C to Pascale Aff. On May 5, 1989, Curnow indicated that the price to plaintiff would be $7.52 per gallon of bulk mix, F.O.B. Fresno, California. Exhibit E to Pascale Aff. Plaintiff then commenced various activities aimed at entry into the business of packaging and distributing Vitari hard pack. Although each of the principals of plaintiff have extensive business experience, none has worked in the frozen dessert packaging and distribution business previously. The principals contacted potential customers to obtain an indication of interest at the retail level, contacted ice cream extruding plants where frozen desserts are manufactured, and contacted Fort Howard regarding the manufacture of containers. Pascale advised Neville Cunningham, the president of Olympus, that the principals were forming a new corporation, were leasing office space and were clearing other business obligations. Pascale Aff. at ¶ 7. Cunningham expressed his support for these activities. *Id.*

The principals of plaintiff, along with an attorney, met with Curnow and Cunningham on May 11, 1989 at plaintiff's office.

The parties spent the first two to three hours reviewing the draft contract in detail. Plaintiff's attorney made a number of "pedantic" objections to the proposed contract, upsetting Curnow and Cunningham. After reviewing the contract, Pascale and Liss both recall Cunningham stating that "you have a deal", indicating that Olympus's attorneys would prepare a final contract for signing. Cunningham did not specifically deny this statement, but stated that no agreement was formalized at the May 11 meeting. None of the parties disputes that a formal contract was never executed, on May 11 or at anytime thereafter.

The rest of the afternoon at the May 11 meeting was spent by the principals of each side discussing marketing plans and general preparations for distribution. In particular, they discussed a taste-test promotion at area Shop–Rite stores, and estimated that the cost would be $30,000. Cunningham indicated that Olympus would share in the expense of this promotion by providing $15,000 worth of product and point of sale promotional material.[2] The parties also discussed and agreed that Olympus would make certain concessions on the price of the bulk mix as a means of financing start-up operations and promotion, though the parties did not at that time agree on a price.

As of May 11, the parties had not agreed on a few items. The parties had not agreed on a final price. The parties had not firmly decided on methods of payments, use of national accounts, volume estimates nor the term of the contract.[3] Cunningham also stated that the parties had not agreed on an extrusion plant.

Following the May 11 meeting, plaintiff made arrangements to obtain 250,000 pint

---

**2.** Cunningham stated in his live testimony that he did not exactly promise to supply the $15,000 worth of product, but only agreed to provide this amount if indeed the parties proceeded with the promotion. It is thus not disputed that the offer was made, and the Court is of the opinion that Cunningham's commitment to provide the product was less conditional than he expressed on the stand.

**3.** As to the term of the contract, plaintiff states that the contract was for renewable one year terms. The last draft contract sent by Olympus, attached as Exhibit I to Pascale's affidavit, only has a blank space for the initial term of the contract, which would then renew itself thereafter for one year terms. Thus, although the parties contemplated renewable one year terms, they had not settled on an initial term.

containers, ordered 15 display freezers and purchased one, hired an expert in the frozen dessert field, Paul J. Fiske, and made numerous presentations to retailers. In an effort to obtain the pint containers, Pascale contacted Fort Howard, which stated that the containers could not be ready for six weeks. Since that date was unacceptable in light of plaintiff's schedule to have the product on the market by early July, Pascale asked Curnow if he could obtain a shipment of containers from the Canadian supplier. Curnow said he could, but that the container markings were not suitable for the United States market. Pascale then contacted a New York supplier who promised delivery within three weeks if plaintiff could provide the art boards. Curnow then sent the original art work for the containers to plaintiff, but the art work was inadequate without the plates held by Fort Howard. Pascale recalls that Curnow agreed to spend $10,000 for the creation of new plates to allow a different company to make the containers to satisfy the early July time schedule. Curnow contended there was some confusion about the plates, admitting that he conditionally promised to make plates available to plaintiff so that containers could be made in time for early July delivery, but only if the parties actually "got into bed together". Curnow stressed that he did not intend to make any firm commitments.[4] Olympus never produced new plates because Fort Howard eventually agreed to produce 250,000 containers on a C.O.D. basis.

Plaintiff began making presentations to various potential customers, including Tuscan Foods, Kinneret Kosher, S & W Ice Cream, Washburn Ice Cream, and others. Olympus provided samples and point-of-sale promotional material, as Curnow says they always do. These presentations resulted in orders for some 500,000 pints. Curnow knew that plaintiff was making demonstrations to potential customers, but believed that they were only related to potential distribution and not sales. In his view, plaintiff was to make a presentation to various potential customers to determine if there was sufficient interest and if plaintiff could actually distribute the product. While making these presentations in mid to late May, however, Curnow believed plaintiff was not going to seek or make any commitments regarding purchase or sale of the product. Curnow said he sent the samples for use at the presentations only for the purpose of learning whether or not anyone might be interested in the product, but said he never intended for plaintiff actually to take orders.

The Court finds this testimony hard to believe and overly self-serving. Plaintiff, with defendant's full knowledge, intended to market the Vitari product by early July. Even if defendant doubted the feasibility of such a date, as Curnow stated, defendant encouraged plaintiff at least through May to press forward at full speed. Neither Curnow nor anyone else from Olympus told anyone from plaintiff that July 1 was not a feasible target date. It is simply difficult to comprehend Curnow's statements that plaintiff was to make presentations, but not sales presentations, that plaintiff was to organize potential customers, without making any commitments, and that plaintiff was to establish lines of distribution, without making any firm arrangements. The Court thus finds that defendant encouraged and intended for plaintiff to make firm arrangements as regards production, distribution and customers.

Also in mid-May, plaintiff leased new office space, arranged with Shop–Rite Supermarkets to allow four weeks of entryway display space for the new Vitari product, to include advance advertising, and worked to obtain kosher certification from the Union of Orthodox Jewish Organizations of America. Olympus worked directly with plaintiff to facilitate advertising and kosher cer-

---

**4.** Curnow repeated throughout his testimony, in response to a good many questions, that Olympus was only at an "exploratory" stage with plaintiff and that he told plaintiff not to make any irreversible commitments. The Court, after carefully analyzing his testimony and that of the other witnesses, doubts the credibility of Curnow's "no commitment" testimony. Whether or not the parties had a contract with each other, defendant certainly encouraged plaintiff to take all steps necessary to move the venture along in anticipation of a contract.

tification. Curnow agreed to send to plaintiff the point of sale advertising, including "coming soon" stickers to be applied to the front of the posters, although he cautioned that they were sent to be used only in the event Olympus decided to proceed with plaintiff.[5] Examples of the posters and the stickers were received in evidence.

John Hansen, another officer with Olympus, worked directly with Pascale in attempting to finalize the kosher certification. Hansen indicated in a memorandum dated May 18, 1989, that "pressure is being applied to expedite approval." *See* Exhibit H to Pascale Affidavit. Hansen indicated that the certification could probably not be obtained in time for the "first hard pack production run", and advised Pascale to leave the certification symbol off the first cup and lid production run, leaving the option of applying certification stickers if approval was obtained prior to distribution. *Id.*[6]

Olympus personnel told plaintiff that it would begin production of 16,000 gallons of bulk hard pack mix, sufficient to make over 200,000 pints, in early June for delivery on June 16, 1989; delivery terms were F.O.B. Olympus's plant in Fresno, California. Pascale arranged with Elco Freight Company to transport the mix from Fresno to the Dunkirk extrusion plant in Buffalo, New York. Curnow denies knowing about the trucking arrangements and denies telling any of plaintiff's personnel that Olympus would make 16,000 gallons for plaintiff's initial production run, though he admits that such a statement may have been made. One of Olympus's officers, Walter Mead, agreed to waive the normal incubation period of 14 days for the mix to allow for shipment on the tenth day in order to expedite transport to the Dunkirk plant. Curnow also did not know of these arrangements, but stated that such an arrangement would not be unusual. Cunningham knew Mead had made shipping

arrangements, but said they were noncommittal and subject to withdrawal. Cunningham, and apparently no one else with defendant, informed plaintiff that the trucking arrangements were in fact noncommittal. When defendant informed plaintiff on June 6, 1989 that the deal was not going forward, Curnow stated that Olympus would have to flush the 16,000 gallons "down the toilet". Curnow denied any significance to the statement, claiming it was merely an Australian expression he used. At the very least, it evidences knowledge of the 16,000 gallons and their intended use. The fact that Olympus was later able to sell the product to other distributors is irrelevant.

Plaintiff hired Paul Fiske during the third week of May, 1989, as an expert consultant, since none of the principals had any experience in the frozen dessert field. On May 25, 1989, a meeting took place in Chicago with Liss, Fiske and Curnow in attendance. The parties disagree as to the purpose of the meeting, with Liss contending the parties met to discuss price allowances and Curnow stating that he wanted the meeting to discuss developments with Olympus's parent company that might prevent the proposed deal from being consummated. Both issues were discussed in one form or another. Fiske expressed his concern to Liss that plaintiff was proceeding without a signed contract, but Liss and the other principals indicated that Curnow and Cunningham assured them that the contract would be forthcoming and that they should proceed nonetheless. Cunningham admitted that he told plaintiff's principals to forge ahead, even absent a written contract, if plaintiff intended to meet the target dates that plaintiff had set. Fiske told Curnow at the meeting that plaintiff was proceeding in reliance on the representation that plaintiff was to proceed, and explained that plaintiff was involved in nego-

---

5.  Again, the Court does not believe that Curnow sent the posters and other materials to plaintiff to be used only in the event Olympus decided to proceed with plaintiff. If that indeed was his intent, it was something his actions belied.

6.  Curnow stated that the reference to a first production one simply indicates the production run that comes before the second, and does not indicate either that the parties had agreed on anything or that Olympus knew that plaintiff was proceeding to production.

tiations with copackers and had initiated trade presentations. Fiske said Curnow told him to proceed with packaging in order to be ready by July 1. The parties then discussed promotional and advertising allowances, as well as a variety of other matters. Curnow asked for plaintiff's volume projections, stating that he needed numbers to take to his superiors. The parties also discussed the selection of a processing plant, and agreed to have further discussions on May 31, since Olympus needed to approve the plant to be used.

In addition to these matters, Curnow informed plaintiff's representatives that the contract could not be signed before June 5. Fiske and Liss testified that Curnow said the contract would be signed on that date, whereas Curnow stated he told them that the contract was "on hold" until June 5, 1989. Curnow then explained that the delay had something to do with Olympus's parent company, Coca–Cola Bottling Company of Australia ("Coca–Cola of Australia"). Fiske and Liss recall that Curnow said the Coca–Cola of Australia board of directors was involved in negotiations on an "unrelated matter", the consideration of which slowed down approval of the license agreement with plaintiff. Curnow denied using the word "unrelated", though with some hesitation, and then stated that he told Liss and Fiske that Olympus simply could not do anything about the contract at that time. Curnow told them to proceed, though he testified that he again reminded them not to make any commitments. It is clear to the Court that plaintiff reasonably believed that Olympus intended to sign the contract, that the delays were not directly related to their agreement, and that Olympus encouraged them to proceed even in the absence of a contract.

On May 31, 1989, Curnow and Liss had a conversation concerning the price of the bulk product. They agreed that the price would be $7.52 per gallon for the first year, minus certain allowances for promotional expenses. Curnow told Liss that the lowest possible price, including the allowances, would be $6.52 per gallon. Liss recalls that Curnow said something to the effect, "If you can live with the price, you have a deal," whereas Curnow remembers saying something to the effect, "If you can't deal with the price, there is no deal." Later that day, Davenport called Curnow to tell him that plaintiff had agreed to the $6.52 figure.

By letter dated May 31, 1989, Cunningham and Curnow stated Olympus's intent to enter into a retail hard pack licensing arrangement. *See* Exhibit H to Pascale Affidavit. The letter reads as follows:

Gentlemen:

This letter serves to confirm my discussion with Sheldon Liss and Paul Fiske on Thursday, May 25.

Clearly it has been determined that the intent of the current management of Olympus Industries is to enter into a retail hard pack licensing arrangement for Vitari, with the above corporation subject of course to pricing and contractual arrangements.

While the intent is noted, it should also be reiterated, as was discussed at the above meeting, that C–C Bottlers (the major shareholder in Olympus Industries), is currently negotiating in areas which may have a direct affect (sic) on the Vitari operation. Accordingly, we are unable to enter into any long-term contract until after these negotiations are completed. This is expected to be June 5.

Understandably, this may inhibit proceedings for a few days; however, it is our belief that should the agreement be signed soon after the 5th, then the launch deadlines are still achievable.

While plaintiff informed their expert, Fiske, that they had received the letter of intent, they failed to let him know that Olympus could not enter into a long-term contract at that time. At the same time, Olympus provided another major U.S. corporation with a letter of intent for worldwide distribution of the Vitari product.

Curnow also sent to plaintiff on May 31, 1989 another draft license agreement. The parties had agreed to most of the terms of the contract, but it was not yet in final form. The initial term of the contract is

blank, and the attachments to the agreement are blank. The copy sent to plaintiff also indicates that plaintiff did not agree with all the terms, as some sections are circled, underlined, marked through or amended. These marks were made by one of plaintiff's principals. The draft refers to plaintiff only as PBL Corporation, not PDL Vitari, and in an attachment by Curnow, he suggests that plaintiff not use Vitari in its corporate name.

The next significant date is June 5, 1989. On that date, Pascale was advised that the processing of the initial order could not begin on June 6 as scheduled, but would have to be delayed until June 10. Also on June 5, plaintiff ordered the hard pack product to be used in a presentation on June 6 to Shop–Rite, which is viewed as the top merchandiser for new products in the New York area. Liss received four containers of product. No one from Olympus told Liss or anyone else with plaintiff to hold off on the presentation or to stop efforts at securing distributors. Liss spoke to Curnow on June 6 shortly before Liss was to make the presentation, and Curnow informed him that the signing of the contract would be delayed another two weeks because of matters concerning Coca–Cola of Australia. At that time, Curnow did not tell Liss to cancel the presentation, nor gave any indication that plaintiff should not proceed.

The meeting on June 6 was organized by Encira Shop–Rite and was attended by plaintiff's representatives, and by Mr. Charles Rinaldo, Mr. Fred Haten, as well as other Shop–Rite supervisors. Haten, who heads a major New York area distribution company, explained that the meeting lasted most of the day, that plaintiff presented the product, and that he made a commitment to accept the product into his distribution network. Through his independent distribution network, Haten was to supply the product to independent retailers. Haten ordered 500,000 pints. Although no written order was made, Haten explained that the industry custom was simply to use purchase orders. Plaintiff never told Haten that plaintiff had not yet executed a written licensing agreement, but Haten

merely assumed that such an agreement existed. Rinaldo, who heads the frozen food department for sixteen Shop–Rite stores, was also greatly impressed with the product presented by plaintiff and proposed to purchase 1000 gallons per store. He testified to the difficulty in obtaining retail space at a supermarket, the amount of necessary planning and the consequences of not delivering as promised. Like Haten, he did not know that plaintiff did not have a written contract, but believed plaintiff had the authority to enter into this agreements with distributors. Both Haten and Rinaldo concluded that plaintiff would find it very difficult to market another product, through them or any other major New York food distributor.

Curnow called Liss later in the day on June 6, after the presentation to Shop–Rite, to inform plaintiff that Olympus would not be able to enter into a license agreement. He explained that matters involving Coca–Cola of Australia made it impossible to proceed as planned. Cunningham wrote on June 9 to confirm that Olympus would not be able to proceed.

## DISCUSSION

■ The well-known standards for a preliminary injunction require plaintiff to establish (1) irreparable harm and (2) either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party. *Long Island Railroad Co. v. Intl Assn of Machinists*, 874 F.2d 901, 910 (2d Cir.1989) (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam)). Injunctive relief would not be proper unless plaintiff can establish both prongs of the above test. A finding of irreparable harm is perhaps the most important prerequisite to the granting of a preliminary injunction. *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir.1983) (citing 11 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2948, at 431 (1973)); *Truglia v. KFC Corp.*, 692 F.Supp. 271, 280 (S.D.N.

Y.1988), *aff'd mem.*, 875 F.2d 308 (2d Cir. 1989) ("The finding of irreparable harm is a *sine qua non* to the granting of a preliminary injunction."). This Court has stated:

> "Irreparable harm can be found where there is a continuing wrong which cannot be adequately redressed by final relief on the merits." *New York Pathological & X-Ray Laboratories v. Immigration and Naturalization Service*, 523 F.2d 79, 81 (2d Cir.1975). Whether or not the wrong can be adequately redressed by final relief on the merits often turns on whether money damages can provide adequate compensation. *Id.; see also Filmtruck, Inc. v. Earls*, 635 F. Supp. 1158, 1165 (S.D.N.Y.1986) (citing *In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir.1985)).

*White Plains Towing Corp. v. Polizzi Towing Corp.*, No. 88 Civ. 6194 (SWK), slip op. at 2, 1988 WL 125680 (S.D.N.Y. November 7, 1988). Thus, a preliminary injunction is "inappropriate if damages can be calculated with reasonable accuracy and a monetary award would provide adequate compensation for the claimed harm." *Truglia, supra*, 692 F.Supp. at 279.

■ Plaintiff argues that breach of the alleged exclusive distributorship agreement effectively destroys plaintiff's entire business, and thus constitutes irreparable harm. Plaintiff, stressing that it is a start-up company, argues that the loss of credibility it will suffer if its orders go unfilled also constitutes irreparable harm. Defendant counters that plaintiff, if it has any case, can find adequate redress through money damages for breach of contract. In addition, defendant stresses that the loss of plaintiff's opportunity to distribute the Vitari product does not constitute the loss of an "ongoing" business, and consequently does not satisfy the test for irreparable harm.

Loss of an ongoing business has been found to constitute irreparable harm, and plaintiff has cited cases that have so held. *Roso–Lino Beverages Distributors, Inc. v. Coca–Cola Bottling Co. of New York*, 749 F.2d 124, 125–26 (2d Cir.1984); *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir.1970); *Travellers Int'l AG v. Trans World Airlines, Inc.*, 684 F.Supp. 1206, 1216 (S.D.N.Y.1988); *Janmort Leasing, Inc. v. Econo–Car Intl, Inc.*, 475 F.Supp. 1282, 1294 (E.D.N.Y. 1979). In deciding that an injunction was appropriate, the Second Circuit stated in *Roso–Lino* that the "loss of Roso–Lino's distributorship, an ongoing business representing many years of effort and the livelihood of its husband and wife owners, constitutes irreparable harm." 749 F.2d at 126. In *Travellers Int'l*, after finding that an unjustified termination of the contract between plaintiff and defendant would destroy plaintiff's unique business, the Court held that the loss of TWA as a customer, the equivalent of losing an entire product line, would irreparably harm plaintiff because defendant TWA constituted 95% of plaintiff's business and because plaintiff had no viable alternative to the TWA business. 684 F.Supp. at 1216.

The facts of this case are distinguishable in a number of ways. First, plaintiff has no "ongoing" business to be destroyed. Plaintiff incorporated in late May, 1989, only a week or two before defendant ended the parties' relationship. All of plaintiff's business activities were preparatory to an expected business, one that never got off the ground. In all of the cases cited by plaintiff, the business destroyed had been in operation for some period of time. *Roso–Lino, supra*, 749 F.2d at 125 (eleven years); *Semmes Motors, supra*, 429 F.2d at 1205 (twenty years); *Travellers Int'l, supra*, 684 F.Supp. at 1209 (three years); *Janmort Leasing, supra*, 475 F.Supp. at 1287 (two years). The fact that plaintiff is a start-up company does not weigh in its favor. While the evidence before the Court demonstrates that defendant did not always deal honestly or forthrightly with plaintiff, plaintiff has not yet established a business the destruction of which constitutes irreparable harm. Indeed, the Court recently held that the termination of an eight-month franchise did not amount to irreparable harm because of the short lifespan of the business. *Truglia, supra*, 692 F.Supp. at 279.

The termination of an ongoing business is irreparable in part because the party's good will is irreparably damaged. *Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 917 (2d Cir.1986) (citing *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 762–63 (2d Cir. 1979)). Plaintiff's business, as it existed, did not have time to develop good will distinct from the Vitari product. As the Second Circuit put it:

> Unlike a dealership that builds up good will and a reputation for reliability, totally distinct from that of the manufacturer, appellee's good will was tied exclusively to his ability to convince his customers of the quality of appellant's ... products. This is significantly different from the dealer whose customers will begin to 'grumble' and go elsewhere if the dealer no longer carries a certain product because the manufacturer has terminated the dealership's contract. *See, e.g., Interphoto Corp. v. Minolta Corp.*, 417 F.2d 621 (2d Cir.1969).

*Loveridge, supra*, 788 F.2d at 917. Indeed, operating under the name PDL Vitari, the Vitari name, which belongs to defendant, may suffer a loss of good will, but that result certainly does no harm to plaintiff outside of whatever contractual rights it has to use the name and distribute the Vitari product. If plaintiff has no right to distribute the product, plaintiff will not be injured by a tarnished Vitari name.

At the same time, the Court recognizes the precarious position that the principals of plaintiff find themselves. The loss of good will that they claim is centered less around their PDL Vitari business as such and more around their own personal reputation. The evidence establishes that they will have a difficult time reentering the frozen dessert market in the New York metropolitan area to the extent the market players will hold the principals responsible for defendant's sudden and unexpected change of heart. But the evidence also establishes that they have no history or background in the frozen dessert market. Nothing in the record suggests that they will not be able to establish a new business, either in food distribution or some other market altogether. The principals' business is that of being entrepreneurs, and this termination does not irreparably affect their ability to practice that art. In addition, plaintiff has not alerted the Court to any cases with facts similar to that of the principals here, and the Court is not aware of any.

Another factor counselling against the granting of a preliminary injunction is the nature of the market for the Vitari product. Defendant intends to license only one distributor for the New York market. Thus, absent competitors to whom plaintiff will lose market share, if plaintiff were to prevail on the merits ultimately, it could simply step into the shoes of whatever company defendant licenses in the interim. "If [plaintiff] should ultimately succeed on the merits of [its] underlying claim, [it] may regain [its] territory. Thus, during the pendency of this litigation [plaintiff's] territory is being continued and preserved for [plaintiff]." *Loveridge, supra*, 788 F.2d at 917.

Finally, the Court believes that plaintiff can be adequately compensated for any damages suffered. If it is ultimately determined that a contract exists between the parties, plaintiff can be compensated for his losses in part by projecting profits from the orders received and in part by looking at the actual sales of the Vitari product, if any. In the alternative, plaintiff may be entitled to permanent injunctive relief enforcing the terms of the contract. Even if no contract is ultimately found to exist, plaintiff can recover money damages on an unjust enrichment or reliance theory. The ability of plaintiff to recover money damages as an adequate remedy for losses suffered precludes a finding of irreparable harm. *Loveridge, supra*, 788 F.2d at 918 (citations omitted).

Having determined that plaintiff does not stand to suffer irreparably, the Court need not consider the other preliminary injunction factors. *Truglia, supra*, 692 F.Supp. at 280. Nonetheless, the Court will briefly discuss plaintiff's likelihood of success on the merits, in part because

these issues have colored the Court's perspective on irreparable harm, and in part to aid further proceedings.

In order to establish likelihood of success on the merits, plaintiff must demonstrate the existence of an enforceable contract. The cases plaintiff cites in support of its contention that it will suffer irreparably by defendant's termination all involve the termination of existing contracts. The existence of the underlying agreement was not in issue in any of the cases cited by plaintiff. Here, the conflicting evidence suggests that plaintiff and defendant agreed to enter into a contract with each other and agreed to take all steps necessary to realize the beginning of a formal contractual relationship, but never took the final step of executing the expected contract. Without question, each party anticipated the signing of a formal licensing agreement. Plaintiff viewed the written contract as a mere formality, but a contract is more than a mere formality. At the very least, the execution of a written contract protects parties from the very ambiguities that are present in this case. Plaintiff's principals, who are experienced businessmen, appear to have let their excitement with the proposed venture cloud their better judgment. They knew a written contract was expected, they did not mention to anyone with whom they dealt that they had not yet formalized their relationship and, at least as of May 31st, knew that some matters before defendant's parent company might directly and adversely affect the proposed venture.

■ Plaintiff stresses, however, that the parties had reached an oral agreement to enter into the licensing agreement. Whether or not a contract exists depends on the intent of the parties. *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 261 (2d Cir.1984), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984). The Second Circuit has summarized the New York rules of construction as follows:

> First, if the parties intend not to be bound until they have executed a formal document embodying their agreement, they will not be bound until then; and second, the mere fact that the parties

contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event. * * * These rules, placing emphasis on intention rather than form, are sensible and reasonable.

*Id.* (citing *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir.1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969)); *Jillcy Film Enterprises v. Home Box Office*, 593 F.Supp. 515, 519 (S.D.N.Y. 1984) (citations omitted). The party arguing that the parties intended not to be bound until the execution of a formal writing has the burden of proving "either that both parties understood they were not to be bound until the executed contract was delivered, or that the other party should have known that the disclaiming party did not intend to be bound before the contract was signed." *Reprosystem, supra*, 727 F.2d at 261. If the parties do not intend to be bound until execution of the contract, the fact that they have agreed on all material terms does not create an enforceable contract. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir.1984) (citing *Schwartz v. Greenberg*, 304 N.Y. 250, 107 N.E.2d 65 (1952)). Here, it is clear that defendant did not intend to bind itself prior to the execution of the formal contract, whereas plaintiff just as clearly did. Thus, the parties had not reached a meeting of the minds on whether or not they intended to be bound.

Consequently, defendant must establish that plaintiff should have known that defendant did not intend to be bound prior to the execution of the anticipated licensing agreement. Since the Court cannot read the parties' minds, "[w]hat matters are the parties' expressed intentions, the words and deeds which constitute objective signs in a given set of circumstances." *R.G. Group, supra*, 751 F.2d at 74 (citations omitted). Four factors are particularly relevant: (1) whether the parties have stated an intention not to be bound absent a written contract, (2) whether one party has performed partially and the other party has accepted such performance, (3) whether there are no issues left to be negotiated

such that the signing of the contract is merely ministerial, and (4) whether the agreement concerns complex business matters such that a written agreement would be the norm, not the exception. *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.1985) (citing *R.G. Group, supra*, 751 F.2d at 75–6).

■ Defendant sent mixed signals in this case. On the one hand, defendant gave every impression to plaintiff that the parties were to operate at full speed even absent a contract. The Court rejects defendant's suggestion that it told plaintiff only to engage in non-committal preparatory work. Plaintiff took a number of concrete steps, with the knowledge and approval of defendant, consistent with the existence of a licensing agreement. Plaintiff arranged for the production of pint-size containers, made various presentations, obtained supermarket shelf space, worked to obtain kosher certification, secured orders far in excess of the minimum required or expected, and arranged for advance advertising. Defendant agreed to pay for certain advertising, provided art work and posters, prepared to ship 16,000 gallons of bulk mix to a specific extrusion plant for early production, and provided samples to plaintiff for presentations. The parties negotiated and agreed on a specific price for the sale of bulk mix to plaintiff. Each of these facts strongly suggests that the parties believed plaintiff had been, or would be, granted the licensing rights in question.

At the same time, the Court does not doubt that both parties expected that their agreement would be reduced to writing in a formal, executed contract. The drafts sent back and forth contain an "entire agreement" clause expressing that the agreement constitutes the exclusive agreement between the parties, superseding all prior agreements, understandings and negotiations. A similar clause in draft agreements, though one that added "when executed and delivered", has been found to establish conclusively the intent of the parties not to be bound prior to execution of the agreement. *See Reprosystem, supra*, 727 F.2d at 262, *cited in R.G. Group, supra*, 751 F.2d at 75. The mere fact that the parties negotiated their agreement with an eye to reducing it to a formal writing, as evidenced by the sending back and forth of draft agreements, suggests strongly, if not conclusively, that the parties intended to be bound only once they had executed the licensing agreement. Plaintiff did not consider the draft sent to them on May 31 as a final version of the contract, as evidenced by the marks made on the draft and the lack of certain terms and appendices, and this fact indicates an understanding of the parties' intent to be bound only once the agreement was executed. *See Winston, supra*, 777 F.2d at 81 (party's indication that written drafts were only drafts, and not final contract evidences intent not to be bound absent written agreement). In addition, defendant's May 31st letter of intent references the expected signing of an agreement. Such reference to an expected written agreement also indicates that parties' intent to be bound only by a written contract. *See R.G. Group, supra*, 751 F.2d at 75 (cases cited).[7] For these reasons, the Court concludes that under the law of this Circuit and the state of New York defendant intended not to be bound contractually prior to the execution of the contemplated licensing agreement, and plaintiff should have known of that fact. Even plaintiff evinced its expectation of a formal contract, suggesting its intent not to be bound prior to its execution.[8]

---

**7.** At the very least, the letter indicates defendant's intent not to be bound prior to the signing of the written agreement, and puts plaintiff on notice of defendant's intentions.

**8.** Defendant makes reference to the New York statute of frauds requirement of a writing. Both General Obligations Law § 5–701 (writing required unless full performance in one year) and Uniform Commercial Code § 2–201 (writing required for contracts of sale over $500) require that contracts of the nature contemplated here be in writing. As defendant points out, although the writing requirement may be satisfied by several writings taken together, the intent of the parties not to be bound until execution of a written contract requires that such contract be signed before the parties will be bound. *Jillcy Film Enterprises, supra*, 593 F.Supp. at 519 (citations omitted). Here, since the only signed writing by defendant, the May

As to the third factor, the presence of terms open to negotiation, the Court finds that the parties had yet to agree on certain essential terms, such as the initial term of the contract. The parties had yet to agree on methods of payment, a marketing plan and other items, each of which had to be negotiated more fully at some time prior to the signing of the agreement. Whether or not these terms were major or minor, essential or pedantic, the disagreements over language and terms in the draft contract reveal that the parties had work left to do and were not yet prepared to sign on the dotted line. The exchange of drafts, the notations of uncertainty as to certain terms and the absence of certain terms indicate that a contract had yet to be reached, at least where the parties intended ultimately to sign a written agreement. *Winston, supra,* 777 F.2d at 82–3.

Finally, the Court considers whether the agreement at issue was the type of contract that was usually put into writing. The evidence presented to the Court does not establish, as a factual matter, whether written agreements are necessary or customary in this field. While defendant contends that a written contract is essential in these circumstances, the retailers who testified suggested that parties often work in the frozen dessert field without written contracts. However, the detail of the drafts exchanged between the parties indicates that the terms of this agreement were complex, and the necessity of a writing presents itself. *See Winston, supra,* 777 F.2d at 83 (the substantial redrafting of the agreement indicates the parties' belief that the terms were essential). The Court also concludes, though not based on evidence presented here, that licensing and distribution agreements are the type of agreements that are usually reduced to writing. They involve the licensing of exclusive proprietary rights, such as the patent and trademark rights at issue here, and

these are usually reduced to writing in most instances.

Three of the four factors indicate strongly that no contract exists here. The parties intended to reduce their agreement to writing, terms were yet to be negotiated and this type of agreement is usually reduced to writing. Although the parties acted in anticipation of the contract by securing orders and negotiating the necessary retail relationships, they did so in the absence of a binding contract. The Court thus finds that plaintiff is not likely to succeed on the merits.[9]

If the Court had found irreparable injury, plaintiff might obtain a preliminary injunction absent a finding of likelihood of success on the merits by raising substantial questions going to the merits and by demonstrating that the balance of hardships tipped decidedly in its favor. *Travellers Int'l, supra,* 684 F.Supp. at 1216. The parties have only discussed these issues in passing and the Court will not elaborate fully on them. Plaintiff of course stands to lose a great deal. The Court is without information as to what Olympus might stand to lose by being required to proceed with the intended venture with payment. Having determined that the parties do not have a contract, substantial questions going to the merits do not present themselves.

## CONCLUSION

For the reasons stated above, the Court denies plaintiff's application for a preliminary injunction.

SO ORDERED.

---

31 letter of intent, refers to the expected execution of a formal contract, the Court concludes that the several drafts and documents exchanged are not sufficient.

**9.** In so concluding the Court does not mean to say that plaintiff could not recover damages for unjust enrichment or promissory estoppel. At this juncture, however, the Court concludes that no contract exists.