Joseph REY, Leticia Jaramillo, and Esperanza Rey–Mehr, as General Partners of Rainbow Broadcasting Company, a Florida Partnership, Plaintiffs,

v.

GUY GANNETT PUBLISHING CO., Individually Guy Gannett Publishing Co., doing business as Guy Gannett Tower Co., Guy Gannett Publishing Co., doing business as Bithlo Tower Company, Gannett Tower Company, Individually, MPE Tower, Inc., Individually, and Gannett Tower Company and MPE Tower, Inc. as General Partner and Co–Partners doing business as Bithlo Tower Company, a Florida General Partnership, Defendants.

No. 90–2554–CIV.

United States District Court,
S.D. Florida.

June 6, 1991.

Malcolm H. Fromberg, Coral Gables, Fla., for plaintiffs.

Charles C. Kline, Miami, Fla., for defendants.

## ORDER DENYING PRELIMINARY INJUNCTION

MARCUS, District Judge.

THIS CAUSE has come before the Court upon Plaintiffs' Motion for Preliminary Injunction against Defendants Guy Gannett Publishing Company, et al. ("Gannett"). Plaintiffs, Rainbow Broadcasting Company, et al. ("Rainbow"), seek the entry of a preliminary injunction to prevent the Defendants from leasing shared television antenna space on the Gannett Bithlo Tower in Bithlo, Florida to Press Broadcasting Company ("Press"). Plaintiffs claim that Defendants leased to them an "exclusive" top-slot antenna space on the Tower, and that Defendants' stated intention to lease antenna space to Press, overlapping with Plaintiffs' top antenna slot, violates the terms of their Lease agreement and would result in irreparable harm to their business. Plaintiffs also assert that they are now prepared to build and place their antenna on the top slot of the Tower. Defendants, on the other hand, argue that the Lease agreement does not grant to Plaintiffs exclusive use to the top television antenna space, that Plaintiffs have not shown irreparable harm, and that, at all events, Plaintiffs have an adequate remedy at law. Pursuant to the agreement of the parties, we conducted an evidentiary hearing on January 11, 16 and 23, 1991. After reviewing the evidence and for the reasons set forth at some length below in our Findings of Fact and Conclusions of Law, we hold that Plaintiffs' Motion for Preliminary Injunction must be DENIED.

### I. FINDINGS OF FACT

1. Defendant Gannett, a corporation organized under the laws of the state of Maine, (also referred to as "Landlord"

throughout the Complaint) owns a communications transmissions tower ("Tower") located in Bithlo, Florida, near Orlando. Gannett, a large media corporation, owns many broadcasting towers both for television and radio stations.

2. Plaintiff Rainbow (also referred to as "Tenant") is a Florida partnership whose general partners are Joseph Rey, Leticia Jaramillo and Esperanza Rey–Mehr. Rainbow is the permittee of television station Channel 65, Orlando, Florida, and desires to place and operate the antenna for the Station at a suitable location.

3. The Tenant–Plaintiff has been granted a Construction Permit issued by the Federal Communications Commission ("FCC") and, based upon Gannett's representations and the execution of a January 6, 1986, Lease Agreement with the Defendants, it filed a site change application and received FCC approval to relocate its antenna to the Tower and install its transmitter in the transmitter building on the Landlord's premises.

4. On January 6, 1986, the Plaintiffs entered into a Lease Agreement ("Lease") with Bithlo Tower Company through its General Partners, Gannett and MPE Tower, Inc.

5. The Lease by its terms plainly and unambiguously provides Rainbow only with "non-exclusive" use of the top television antenna space. In pertinent part, it states:

> All of the space, premises, and rights granted herein on a limited and a *non-exclusive* basis are hereinafter referred to as the "leased premises."

(emphasis added). Importantly, Article I of the Lease, entitled *Leased Premises*, explicitly includes "antenna space." We do not believe that the parties to this contract bargained for Rainbow's "exclusive" use of the top television antenna space on Gannett's Bithlo Tower. The contract specifically provides for "nonexclusive" use, and, we find that no one at Gannett ever represented to Rainbow that it would enjoy "exclusive" use of the top of the Tower. Indeed, according to the testimony of James Baker, Gannett Publishing's Vice President, which we credit, Gannett has never leased "exclusive" antenna space to any of its tenants on any of its towers.

6. The Lease, by its terms, grants Rainbow a television antenna position but provides that Rainbow will share the same or similar antenna space with other tenants. Article XII, *Interference*, reads:

> *Interference by Tenant.* Tenant understands that Landlord intends to grant to other tenants facilities and/or rights which are the same as, or similar to, those granted herein to Tenant. Tenant will endeavor in good faith to conduct its activities to cooperate with other tenants and potential tenants so as to anticipate and prevent interference.

7. According to the testimony of Richard Hoffman, Plaintiff's lawyer, the following clause in the Lease was added when Gannett was negotiating with Channel 52 for Channel 52 to place a television antenna on the Gannett Tower:

> The parties hereto expressly agree that the terms and conditions of this lease shall be binding only as they relate to the top television broadcasting antenna space located on the Bithlo Tower. If the top television broadcasting antenna space on the Bithlo Tower is otherwise occupied, this lease shall be null and void.

The clause pertained to and related solely to Gannett's then current negotiations to lease Channel 52, the top television antenna space on the Gannett Tower, and would have allowed Rainbow to declare the lease null and void only if Gannett leased the top television antenna space to Channel 52 before Rainbow's agreement of lease was fully executed by the required signatories.

8. Defendants/Landlords have advised the Plaintiffs/Tenants that they intend to allow a television competitor of Plaintiffs, Press Broadcasting Company, ("Press"), to occupy and share an antenna position within the aperture of the Tower's top slot. Press is ready to enter into a lease with Gannett for space on the Gannett Bithlo Tower.

9. In 1988, the Federal Communications Commission ("FCC") granted to Press a construction permit to operate Channel 68.

Channel 68 is a competitor of Rainbow and competes for the same advertising money, but does not now cover the same market area as Rainbow would cover.

10. Channel 68 has been on the air and broadcasting since 1988, and in 1989, the FCC gave permission for a "swap" whereby the Press Channel 68 will become Channel 18 and broadcast with an antenna from the Bithlo Tower.

11. The FCC approved the request by Press to move the Press antenna for placement on the Bithlo Tower. In order to meet the height requirement set by the FCC, some portion of the Press antenna would have to be located at the same height as some portion of the Rainbow antenna, but the Press antenna would be located physically on a different leg or face of the Bithlo Tower than the Rainbow television antenna. Rainbow unsuccessfully opposed the Channel 68/18 swap before the FCC.

12. Rainbow has not yet selected or purchased an antenna to go on the Gannett Bithlow Tower; nor has it selected a proper transmitter. Rainbow only held a construction permit which was scheduled to expire on January 31, 1991. Rainbow also has not obtained any financing commitment for the project.

13. Susan Harrison, appearing on behalf of Rainbow, testified that, should Rainbow (Channel 65) become the fifth commercial station in the Orlando market, she could reasonably forecast the cash flow of the station in any given year as well as evaluate the future fair market value of the station.

14. The FCC allocates television stations for a given area. The overall policy of the FCC is to promote competition in the best interests of the general public.

15. The Plaintiffs have not established that the placement of a second antenna on a face or leg of the Tower would result in any significant interference to Rainbow's operation. Leonard Spragg, called by Plaintiffs as an expert electronics consulting engineer, testified, among other things, that an engineering study would be required to determine what impact a second antenna would have on the same tower, and that no such study—a costly undertaking—had been made. He added that he lacked the expertise required to make the necessary calculations to determine any modifications in coverage. Spragg also testified that it was not uncommon for television antennas to overlap or share space on the same tower. Richard Edwards, Vice President and Director–Engineer for Gannett, also testified, and, observed that Gannett has often mounted more than one antenna with shared aperture on the same tower. Edwards added that more than one antenna could technically share space on the Bithlo Tower, that any projected interference could be mathematically computed, and that interference was not anticipated on the Bithlo Tower.

## II. CONCLUSIONS OF LAW

### A. *Prerequisites To Injunctive Relief*

■ It is undisputed that under federal law in this Circuit Plaintiffs must prove four elements to obtain a preliminary injunction. Pursuant to Fed.R.Civ.P. 65, a district court is reposed with discretionary power to grant preliminary injunctive relief. *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir.1983); *Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328, 332 (5th Cir.1981). In exercising its discretion, however, the court must evaluate and balance four recognized prerequisites to preliminary injunctive relief: (1) a substantial likelihood that the movant will prevail on the underlying merits of the case; (2) a substantial threat that the moving party will suffer irreparable damage if relief is denied; (3) a finding that the threatened injury to the movant outweighs the harm the injunction may cause defendant; and (4) a finding that the entry of a preliminary injunction would not disserve the public interest. *Tally–Ho, Inc. v. Coast Community College District*, 889 F.2d 1018, 1022 (11th Cir.1989). It is also well established in this Circuit that Plaintiffs bear the burden of persuasion on *all* four preliminary injunctive standards.

*United States v. Jefferson County*, 720 F.2d 1511 (11th Cir.1983).

Moreover, in exercising its discretion, a court is guided by established rules and principles of equity jurisprudence. *Muss v. City of Miami Beach*, 312 So.2d 553, 554 (Fla.3d DCA), *cert. denied*, 321 So.2d 553 (Fla.1975). And we are reminded that "a preliminary injunction is an extraordinary and drastic remedy"; it is the exception and not the rule. *Canal Authority v. Callaway*, 489 F.2d 567, 573 (5th Cir.1974).

Because we believe that Plaintiffs have failed to meet their burden of persuasion on each of the prerequisites, the motion for preliminary injunction relief must be denied.

### B. *Substantial Likelihood of Success*

As a threshhold matter the Plaintiffs argue that the Lease agreement between Rainbow and Gannett grants Rainbow "exclusive" use of the top television antenna space on the tower. Plaintiffs rely principally on the Lease and the Lease's "Exhibit C." As to the Lease, Plaintiffs only point to the following clause which appears at the beginning of the document:

> The parties hereto expressly agree that the terms and conditions of this lease shall be binding only as they relate to the top television broadcasting antenna space located on the Bithlo Tower. If the top television broadcasting antenna space on the Bithlo Tower is otherwise occupied, this lease shall be null and void.

Plaintiffs suggest that this clause evidences that it entered into the Lease with the binding understanding that its leased space was an "exclusive" one at the top slot of the Tower. We disagree. In the first place, this clause is silent on the issue of "exclusivity"; it only states that the Lease will be void if the top slot is occupied at the time the Lease is executed. In fact, the testimony at the hearings illustrated that the clause pertained to and was related solely to Gannett's then current negotiations to lease Channel 52 the top antenna space on the Bithlo Tower, and would have allowed Rainbow to declare the lease null and void only if Gannett had leased the top

space to Channel 52 before Rainbow's agreement of lease was fully executed by the required signatories. The clause says nothing about sharing space or overlapping antennas. And, as we have already observed, it is not an uncommon practice for television antennas to overlap with other antennas on the same tower.

■■■ In the second place, the plain language of the agreement of lease does not grant Plaintiffs "exclusive" use of the top television antenna space. It is well-settled that when contractual language is clear and unambiguous, the court cannot indulge in construction or interpretation of its plain meaning. *Hurt v. Leatherby Insurance Company*, 380 So.2d 432 (Fla.1980). A court may not violate the clear meaning of a contract in order to create an ambiguity. *Hoffman v. Robinson*, 213 So.2d 267 (Fla. App.1968). An ambiguity exists only when a word or phrase in a contract is of uncertain meaning and may be fairly understood in more ways than one and is susceptible of more than one meaning and of interpretation in opposite ways. *Friedman, et al. v. Virginia Metal Products Corp.*, 56 So.2d 515 (Fla.1952). But, if a contract is unambiguous, the actual language used in the contract is the best evidence of the intent of the parties, and the contract terms will be given their plain meaning. *Herrero v. Herrero*, 528 So.2d 1286 (Fla.2d DCA 1988).

The Lease may "fairly" be interpreted in only one way. Its terms are unambiguous and its meaning plain. As set forth above, the agreement specifically does not grant "exclusive" use of the top slot of the Bithlo Tower. Rather it says:

> All of the space, premises, and rights granted herein on a limited and a *non-exclusive* basis are hereinafter referred to as the "leased premises."

(emphasis added). We can only find from a clear reading that Rainbow's antenna space was granted, pursuant to the unambiguous terms of the lease, on a "... non-exclusive basis...." In addition, Article XII, *Interference*, states in pertinent part:

> (a) *Interference By Tenant.* Tenant understands that landlord intends to grant

to other tenants facilities and/or rights which are the same as, or similar to, those granted herein to tenant.

Once again, the Lease unambiguously says that Rainbow's antenna space will be granted on a "non-exclusive" basis. In light of this clear language Plaintiffs have not shown a substantial likelihood of success on the merits as to this dispositive issue. Moreover, we have found that Gannett never promised Plaintiffs "exclusive" use of the Tower, nor did the parties bargain for "exclusive" use.

As to Exhibit C of the Lease, Plaintiffs argue that this engineering diagram, depicting the Tower's configuration and available spaces for antennas, demonstrates that Rainbow had "exclusive" rights to the top slot of the Tower. First, Defendants have argued that Exhibit C was not part of the Lease, was not agreed to by the parties, and was never executed by Gannett. Plaintiffs, on the other hand, asserted that the Exhibit was attached to their final version of the Lease. Putting that dispute aside, we believe in any event that Exhibit C does not help on the "exclusivity" issue, but rather only illustrates a standard proposal for the Tower's structure with height and mounting configurations. Indeed, Plaintiffs' engineering expert, Mr. Leonard Spragg, testified that Exhibit C is a "standard" engineering document executed when the Lease has received FCC approval and the antenna agreements are finalized. Mr. Spragg testified that although Exhibit C shows two antenna spaces, one above the other, the Exhibit, along with the notes, only depict the "type" of antenna one should purchase for the specific tower, and he observed that the Exhibit did not deal with "exclusivity" issues or even made reference specifically to Rainbow. In fact, Mr. Spragg stated that Plaintiffs hired him to select the appropriate antenna and that Plaintiffs asked him to look into an antenna similar to the one used by Channel 33, which Mr. Spragg admitted was placed in a tower "overlapping" other antennas. Mr. Spragg also offered the view that Exhibit C cannot "lock" a tenant to an actual location of antennas since Exhibit C only deals with general heights and types of antennas which should be purchased.

Exhibit C, even if part of the Lease, does not prove in any way that Rainbow received an "exclusive" slot simply because its slot was depicted as the top one in the diagram. Exhibit C is in fact a standard engineering diagram designed to illustrate the proposed heights and providing other "general" engineering information. The diagram, as we read it, does not illustrate that a proposed slot on the diagram can only carry one antenna. Mr. Spragg also testified that other towers throughout the United States located in Miami, San Francisco, Atlanta, New York, and Washington, D.C., which use the same standard exhibits as Exhibit C in their leases, have overlapping antennas mounted on different faces of a tower. At all events, in light of the unambiguous language of the Lease, Plaintiffs have not likely proven that they bargained for an "exclusive" top slot. We add that the Lease was a product bargained for at arms length by attorneys who were aware of the Lease's provisions regarding non-exclusivity. In fact, the Plaintiffs' attorney, Mr. Hoffman, could not testify that the issue of "exclusivity" was even addressed during negotiations. Mr. Hoffman specifically stated that all he understood was that he was to bargain for the "top slot." He did not recall that "exclusivity" was discussed and admitted that he did not object to the explicit provision contained in the Lease stating that the "leased premises" were leased on a "non-exclusive" basis. Plaintiffs' failure to sustain its burden on this matter alone compels us to deny the motion.

### C. *Irreparable Harm*

█ Even assuming that Plaintiffs would likely prevail on the merits, they have failed to carry their burden on irreparable harm. We are reminded that when looking at irreparable harm,

the key word in this consideration is "irreparable." Mere injuries, however substantial, in terms of money, time, and injury necessarily expended in the absence of a stay are not enough. The possibility of adequate compensatory or

other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm. *United States of America v. Jefferson County*, 720 F.2d 1511 (11th Cir.1983). And it is well settled that in order to demonstrate irreparable harm, the Plaintiffs must show potential harm which cannot be redressed by a legal or equitable remedy following a trial. The preliminary injunction must be the only way of protecting the Plaintiffs from harm. *Instant Air Freight Company v. C.F. Air Freight, Inc.*, 882 F.Supp. 797 (3d Cir.1989).

Plaintiffs rely on the testimony of Susan Harrison, a principal of a Washington, D.C. consulting firm in television systems, who testified that if Press is allowed to come onto the market "before" Rainbow, then Rainbow will lose the opportunity to attract sufficient advertisers and audience share necessary to become a viable station. Despite this testimony, Ms. Harrison essentially illustrated that Plaintiffs had other legal remedies available. Ms. Harrison opined that should Channel 65 become the fifth commercial station in the Orlando area and thereby "beat" Press into the marketplace, it could expect an audience share of 4% to 5%. Ms. Harrison calibrated the revenue and cash flow in the fifth to sixth year of operation as likely to be some $5,000,000.00 per year. Furthermore, she projected a fair market value of $40,000,-000.00 to $50,000,000.00 for the station. These careful projections suggest that a damage remedy may be available to Plaintiffs. Damages seem to be quantifiable with reasonable accuracy, and a monetary award would provide adequate compensation for claimed harm. *See, e.g., PDL Vitari Corp. v. Olympus Industries, Inc.*, 718 F.Supp. 197 (S.D.N.Y.1989).

Moreover, Plaintiffs' injury can neither be remote nor speculative, but rather must be actual and imminent in order to obtain injunctive relief. *Consolidated Brands, Inc. v. Mondi*, 638 F.Supp. 152 (E.D.N.Y. 1986). Rainbow's claim of damages, however, appear speculative and remote. First, Rainbow has not arranged financing; a note for financing has not been complet-

ed. As there is no convincing proof that Rainbow actually has financial backing, the claim of irreparable harm appears speculative. Second, and more important, although an injunction may be granted where the prospective breach threatens the destruction of an "ongoing" business, *Semmes Motors, Inc. v. Ford Motor Company*, 429 F.2d 1197 (2d Cir.1970), Plaintiff's business cannot truly be characterized as ongoing. At this point, Rainbow only owns a construction permit and a lease. The evidence illustrated that since 1982, Rainbow has yet to obtain financing, has not selected or purchased an antenna, has not selected a wave guide, has not selected a transmitter, has not obtained building plans for a broadcast building and has not gone on the air. In short, Plaintiffs have not likely proven that their business is ongoing and in fear of destruction. Again, these circumstances do not warrant the issuance of a preliminary injunction.

### D. *Balance of Hardships*

Since Plaintiffs have neither established a likelihood of success on the merits nor irreparable harm, we need not address the other prerequisites. However, it is worth noting again that Plaintiffs' perceived threat remains speculative as it has not contracted for an antenna, selected a wave guide, or drawn plans for a broadcasting, while Gannett has a ready tenant who is willing to immediately go on the Tower at a rent that was approximated at $70,000.00 per year. Under these circumstances, Plaintiffs have not convincingly established that the balance of harms tips decidedly in their favor.

### E. *Public Interest*

Finally, Plaintiffs must demonstrate that injunctive relief will not disserve the public interest. The granting of preliminary injunctive relief in this case, however, will disserve the public interest. The FCC has shown its intention to encourage competition in such regulations as 47 CFR Ch. 1 § 73.635. The FCC, in *The Matter of Policies Regarding Detrimental Effects of Proposed New Broadcasting Stations on*

*Existing Stations,* 3 FCC Rcd 3, Pg. 638, specifically abandoned the *Carroll* doctrine which had allowed the FCC to consider proof of detrimental economic effect upon an existing station before granting a license to a new station. The FCC held that such considerations were anti-competitive in nature and that competition was in the public interest. We note that as a general rule, federal courts defer to and follow policies created by federal agencies since "there is a presumption of regularity of administrative action," *Mountain States Telephone & Telegraph Co. v. United States,* 499 F.2d 611, 615, 204 Ct.Cl. 521 (1974), and courts are "loath" to disrupt or interfere with administrative practices. *Girard Trust Bank v. United States,* 602 F.2d 938, 221 Ct.Cl. 134 (1979).

In addition, the FCC, in its decision concerning the Channel 68/18 swap, once again reiterated its policy of encouraging competition. The FCC in *Amendment of § 73.606(b), Table of Allotments, Television Broadcast Stations (Clermont and Cocoa Florida),* 67 RR 2d pg. 265, 269, stated that it would not deny the Channel 68/18 exchange on grounds brought forward by CCI (Community Communications, Inc., licensee of public television station WMFE–TV Orlando), that CCI would suffer a significant loss of viewers should the swap be allowed. The FCC specifically stated: "... even if CCI runs the risk of losing viewers, we cannot prevent a channel expansion solely to protect a broadcaster from competition." In the case at bar, Rainbow seeks to prevent competition. We cannot find that granting injunctive relief would serve the public interest. Indeed, federal courts have long emphasized the policy that "[i]n a competitive market the customers will pick the arrangements that work best for them.... [u]nless courts insist on a showing of market power, they run the risk of deleting one of the existing options and so reducing rather than enhancing the vigor of competition and the welfare of consumers." *Will v. Comprehensive Accounting Corp.,* 776 F.2d 665 (7th Cir.1985). Furthermore, as to the view that the maintenance of competition is in the best interests of the public welfare, the Supreme Court has noted: "[laws have been] enacted to assure customers the benefits of competition, and our prior cases have emphasized the central interest in protecting the economic freedom of participants in the relevant market.... [laws which protect competition] are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 103 S.Ct. 897, 908, 908 n. 38 (1983).

■ In light of the foregoing and because Plaintiffs have failed to sustain their burden, it is hereby

ORDERED AND ADJUDGED that Plaintiffs' Motion for Preliminary Injunction is DENIED.

DONE AND ORDERED.