**In re Nicholas C. ARGIANNIS,
Elizabeth P. Argiannis,
Debtors.**

**Bankruptcy No. 90–5138–BKC–3P7.**

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

June 15, 1993.

Ronald L. Bergwerk, Jacksonville, FL, for debtors.

Alexander G. Smith, Jacksonville, FL, trustee.

Raymond R. Magley, Jacksonville, FL, for claimant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### CLAIMS 19 AND 20

GEORGE L. PROCTOR, Bankruptcy Judge.

This case is before the Court on debtors' objection to claims 19 and 20 filed by William Rickman ("Rickman"). The Court held hearings on July 23, 1992, and February 24, 1993. Upon the evidence presented, the following findings of fact and conclusions of law are entered:

*Findings of Fact—Claim 19*

The parties offered as a joint exhibit in evidence a stipulation of facts.[1]

The stipulation as to claim 19 is as follows:

1. On July 11, 1989, Rickman, the debtors and the debtors' relatives, James and Hrisolua Eskinzes, entered into a written agreement ("the Agreement") by which Rickman agreed to convey to the debtors the parcel of real property located in Ocala, Florida, known as Ocala Downs Farm ("Ocala Downs"). In exchange, the debtors agreed to (i) convey to Rickman two

---

[1.] References to exhibits are deleted from the stipulation.

parcels (a 50 acre parcel and a 14 acre parcel) of real property located in Gilbert Corner, Virginia, (the "Gilbert Corner Property") and (ii) repurchase from Rickman the Gilbert Corner Property within one year of the closing date for a purchase price of $1,840,000.00 plus interest at the rate of nine percent (9%) per annum from September 1, 1989, to the closing date. In addition, as described in paragraph 2, Rickman agreed to loan the debtors $1,000,-000.00, and the debtors agreed to grant Rickman a lien on certain real property.

2. On July 14, 1989, pursuant to the terms of the Agreement, the debtors executed and delivered to Rickman a Deed of Trust Note in the principal amount of $1,000,000 (the "Note"). The debtors' obligation under this Note is secured by (i) a second priority lien on Ocala Downs, (ii) a second priority lien on debtors' 34.7947 acre parcel of real property in Aldie, Virginia, (the "Virginia Property") and (iii) a third priority lien on debtors' Daybreak Farm in Ocala, Florida.

3. The debtors used the proceeds from the Note as follows:

a. $130,000.00 was paid in partial satisfaction of a promissory note on which the debtors were the obligor which was secured by (i) a second lien on the 14 acre parcel of property in Gilbert Corner, and (ii) a first lien on a 47 acre parcel of property in Virginia which was conveyed by the debtors to a third party;

b. $475,000.00 was paid in full satisfaction of a promissory note on which the debtors were the obligor which was secured by (i) a first lien on the 50 acre parcel of property in Gilbert Corner, and (ii) a second lien on the 14 acre parcel of property in Gilbert Corner and on the Virginia Property;

c. $350,929.80 was paid to the debtors for their own use; and

d. the balance was paid in satisfaction of miscellaneous closing costs.

4. At the time of the conveyance of Ocala Downs to the debtors, Ocala Downs was encumbered by a first mortgage in the amount of $127,385.55. Paragraph 2a of the agreement states, among other things, that:

> Rickman shall remain liable on [the First Mortgage on Ocala Downs] and shall be responsible for the monthly installments thereon. At the time of the closing on the repurchase of [the Gilbert Corner Property] by Argiannis, Rickman shall pay the balance of said mortgage in full.

5. Central Florida Financial Services, Inc., holds the first priority lien on Ocala Downs. Warrenton Farm Credit, ACA, holds the first priority lien on the Virginia Property. Rickman holds the first and second priority liens on Daybreak Farm which is the subject of a foreclosure action pending in Ocala.

6. On December 10, 1990, (the "Petition Date"), the debtors filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

7. As of the Petition Date, the amount due under the Note was $1,209,716.81.

8. On January 29, 1992, (prior to the date this case was converted from Chapter 11 to Chapter 7), the Bankruptcy Court entered an order valuing Ocala Downs at $1,275,000.00 and the Virginia Property at $474,000.00. The amount due the first lienholder on Ocala Downs on the Petition Date was $127,181.27. The amount due the first lienholder on the Virginia Property on the Petition Date was $113,918.99.

9. On July 9, 1991, the debtors filed a notice of abandonment of Ocala Downs. No objections to the notice of abandonment were filed and on July 24, 1991, Ocala Downs was deemed abandoned.

10. As of July 24, 1991, the amount due Rickman under the Note, without deducting the value of Ocala Downs, was $1,287,-494.59 and the amount due the first lienholder on Ocala Downs was $116,481.42.

11. On November 18, 1991, the debtors delivered to Rickman a deed to Ocala Downs. As of this date, the amount due Rickman under the Note, without deducting the value of Ocala Downs, was $1,328,-591.46 and the amount due the first lienholder on Ocala Downs was $116,481.42.

*Findings of Fact—Claim 20*

The stipulation for claim 20 is as follows:

1. Prior to July 11, 1989, the debtors owned two parcels of real property located in Gilbert Corner, Virginia, 50 acres and 14 acres, totalling 64 acres (the "Gilbert Corner Property").

2. On July 11, 1989, Rickman, the debtors and the debtors' relatives, James and Hrisoula Eskinzes, entered into a written agreement (the "Agreement") by which Rickman agreed to convey to the Debtors the parcel of real property located in Ocala, Florida, known as Ocala Downs Farm. In exchange, the debtors agreed to (i) convey to Rickman the Gilbert Corner Property, and (ii) repurchase from Rickman the Gilbert Corner Property within one year of the closing date for a purchase price of $1,840,000.00 (the agreed upon purchase price of Ocala Downs Farm) plus interest at the rate of nine percent (9%) per annum from September 1, 1989, to the closing date.

3. Paragraph 3(g) of the Agreement provided that in the event of a default by the debtors to repurchase the Gilbert Corner Property, Rickman may, at his option:

(i) institute an action for specific performance;

(ii) retain title to the Gilbert Corner Property as liquidated damages; and

(iii) sell the Gilbert Corner Property at public or private sale and apply the proceeds to satisfy the amount due Rickman and obtain a judgment against the debtors for the deficiency.

4. On or about July 14, 1989, the parties closed the transactions described in the Agreement. In connection with the closing, Rickman and the debtors entered into a Memorandum of Agreement which restated the debtors' obligations to repurchase the Gilbert Corner Property and recorded the Memorandum in the Real Property Records of Loudoun County, Virginia.

5. The debtors breached the Agreement by failing to repurchase the Gilbert Corner Property.

6. Between the date of the breach, July 14, 1990, and the date of the Chapter 11 petition, December 10, 1990, Rickman did not sue for specific performance or sell the property to a third party. Rickman still owns the property.

7. On February 28, 1991, Rickman filed claim 20 in the debtors' Chapter 11 case in the amount of $1,019,153.06 for damages allegedly sustained as a result of the debtors' breach of their Agreement to repurchase the Gilbert Corner Property. This amount was calculated as follows:

| | |
|---|---|
| $2,050,969.86 | (Purchase Price due Rickman on Petition Date) |
| 1,031,816.80 | (*Less* value of the Gilbert Corner Property) |
| $1,019,153.06 | (Total) |

---

*Conclusions of Law*

■■■ The Code addresses the allowance of claims in § 502 which states in pertinent part as follows:

(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

(b) Except as provided in subsections (e)(2),(f), (g) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim

. . . . .

Upon objection, § 502 provides that the Court determine the extent of a claim's validity. *In re Charter Co.*, 63 B.R. 568 (Bankr.M.D.Fla.1986). Claims are "presumed valid and [are] prima facie evidence of validity and amount." *In re Brinson*, 7 Fla.Law W. Fed. B100. The objecting party must come forward with affirmative proof to rebut this presumption. *Id.* at 2.

Rickman filed claims 19 and 20 on March 15, 1991, and debtors filed a written objection challenging the amount of the claims on March 12, 1992. Pursuant to § 502(b) the Court must determine the amount of Rickman's claims.

### Claim 19

In the July 11, 1989, agreement Rickman agreed to take a second mortgage on Ocala Downs and on the 34.7947 acres in Aldie, Virginia, as security for a $1 million loan to debtors. On July 14, 1989, debtors executed a Deed of Trust Note for the principal amount secured by the properties.

Section 506(a) governs the classification of allowed claims into secured and unsecured portions. Section 506(a) states in pertinent part as follows:

> (a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim.

Debtors granted Rickman a lien in these two properties. Consequently, he is a secured creditor to the extent of his interest in the estate's interest in the property.

To calculate the allowable amount of Rickman's claim and the extent of his interest in the property the Court must determine the amount due on the note. The July 11, 1989, agreement called for interest to accrue at twelve and one half percent (12½%) per annum on the note's principal. Accordingly, on the petition date the amount due on the note was 1,209,716.81.

Rickman argues that he is entitled to interest on the note from July 14, 1989, until November 18, 1991, the date that he received the deed to Ocala Downs. The amount due under the note on November 18, 1991, was $1,328,591.46.

On the other hand, debtors contend that Rickman is only entitled to interest until July 24, 1991, the date debtors abandoned Ocala Downs. Debtors argue that interest cannot accrue on a claim when the property is no longer part of the estate. The amount due under the note on July, 24, 1991, was $1,287,494.59.

■ For Rickman to be entitled to post-petition interest he must be oversecured. *In re Canaveral Seafoods, Inc.*, 79 B.R. 57 (Bankr.M.D.Fla.1987). Section 506(b) governs the allowance of post-petition interest on secured claims and states in pertinent part as follows:

> (b) To the extent that an allowed secured claim is secured by property the value of which, ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim....

■ Rickman received a second mortgage on the Virginia property in addition to the second mortgage on Ocala Downs. If aggregating the value of Ocala Downs with the value of the Virginia property creates a surplus, then Rickman is oversecured and is entitled to post-petition interest. Thus to determine whether Rickman should receive post-petition interest, the Court must ascertain the value of both the Virginia property and Ocala Downs. In valuing the property, the Court notes that it must consider the purpose for valuation and that the appropriate valuation date is the petition date. *In re Adams*, 2 B.R. 313 (Bankr.M.D.Fla.1980); *In re Weber*, 140 B.R. 707 (Bankr.S.D.Ohio 1992).

By January 29, 1992, Order of this Court, the value of the Virginia property was $474,000.00. David LeRoy, CRE, testified that he appraised the property on June 17, 1991, to determine the value on the petition date and that value was $474,000. LeRoy used the market comparison method that utilizes sales of similar properties and adjusts those figures to reflect the unique

characteristics of the subject property to arrive at an estimated value for the property. There being no other evidence as to value, the Court accepts this value.

Both debtors and Rickman offered evidence of the value of Ocala Downs. Debtor testified that he had been trying to sell Ocala Downs for $1.35 million prior to abandoning the property. Debtor also testified that he was unable to consummate the sale, and when the property was abandoned on July 24, 1991, Rickman was informed of the potential sale. Debtors valued Ocala Downs at $1.2 million in their schedule of financial affairs. Rickman testified that Ocala Downs is listed with a broker for $1.3 million.

John Arline, MAI, SRA, and state certified appraiser, testified that he had inspected Ocala Downs on September 3, 1991, and October 27, 1992. Arline valued the property at $1,100,000.00 on July 24, 1991, and on October 27, 1992. Arline also utilized the market approach comparing recent sales of similar property with the subject property to determine the value the subject property would likely sell for between a willing and informed buyer and seller. *In re Brinson*, 7 Fla.Law W.Fed. B100. Arline valued the property using the cost approach but did not utilize that figure because he felt that cost was not a good indicator of the value of the property given current market conditions. Arline testified that he was unsure whether the property would have had the same value on the petition date.

The Court finds that Arline's appraisal is the most reliable evidence of value and accepts his valuation of $1.1 million for Ocala Downs. The Court notes that this value is consistent with debtors' own valuation in their statement of financial affairs when the cost of selling the property is accounted for. *In re Adams* 2 B.R. 313 (Bankr.M.D.Fla.1980); *In re Weber*, 140 B.R. 707 (Bankr.S.D.Ohio 1992).

Accordingly, the value of Ocala Downs is $1,100,000.00, and the value of the Virginia property is $474,000. Thus, estate's interest in the property securing the note is 1,574,000.00. However, to determine the

extent of Rickman's interest in the property, the first mortgages on Ocala Downs and on the Virginia property must be deducted from the value of the property. *In re Bellman Farms, Inc.*, 86 B.R. 1016 (Bankr.D.S.D.1988). On the petition date, the amount due on the first mortgage on Ocala Downs was $127,181.27, and the amount due on the Virginia property was $113,918.99. Thus, the value left to secure the debt owed Rickman is $1,343,599.61. Because this amount is greater than the amount due on the note on the petition date, Rickman is oversecured and is entitled to post-petition interest.

█ Next, the Court must decide what length of time post-petition interest may accrue. To make this decision requires an examination of the effect abandoning Ocala Downs had on the accrual of interest. The effect of abandonment is to divest the estate of control of the abandoned property and to revest title in the debtor. *In re Caron*, 50 B.R. 27 (Bankr.N.D.Ga.1984); 4 Collier on Bankruptcy, 554.02[2], 554–7 (15th ed. 1986). The property becomes part of debtor's non-bankruptcy estate just as if no bankruptcy had occurred. *In re R–B–Co., Inc. of Bossier*, 59 B.R. 43, (Bankr. W.D.La.1986). Thus, on July 24, 1991, when Ocala Downs was deemed abandoned, the estate no longer had an interest in the property. Pursuant to § 506(b) allowable post-petition interest accrues on the creditor's interest in the estate's interest in the property. After abandonment on July 24, 1991, the estate no longer had an interest in Ocala Downs on which Rickman's interest could accrue. However, the estate still has an interest in the Virginia property; consequently, to the extent of the estate's interest in the Virginia property, Rickman may collect interest on his claim after Ocala Downs was abandoned.

█ The parties also disagree on who is liable for the first mortgage on Ocala Downs. In the July 11, 1991, agreement Rickman agreed to pay the first mortgage held by Central Florida Financial Services, Inc. The contract reads as follows:

2(a). The Florida Property shall be conveyed unto Argiannis ... subject to a

certain mortgage owing to the Central Florida Financial Services, Inc., which mortgage has an approximate balance of $130,000.00. Rickman shall remain liable on said mortgage and shall be responsible for the payment of all monthly installments thereon. At time of closing on the repurchase of Parcel One and Parcel Two by Argiannis, Rickman shall pay the balance of said mortgage in full.

The provisions addressing the loan from Rickman to debtor include the following:

f. Provided Argiannis has not been in default in the payment of the obligations hereinabove described ... he shall have the option to extend the maturity date for payment of the One Million Five Hundred Thousand Dollar [sic] ($1,000,-000.00) loan for a period not to exceed one year, upon payment to Rickman, at the time the option is exercised of all interest accrued on the loan.

■ In construing contractual language the Court must "ascertain and effectuate the parties lawful intentions." *Jackson v. North America Assurance Society of Virginia, Inc.,* 212 Va. 177, 179, 183 S.E.2d 160 (1971). Virginia law controls the interpretation of the contract, because this is a question regarding the performance of the contract. *Center Chemical Co. v. Avril, Inc.,* 392 F.2d 289 (5th Cir.1968)[2] The agreement evidences an intention that Rickman remain liable on the first mortgage in all situations. The contract calls for payment in full of the first mortgage at the time of repurchase or payment in full over a period of time that varies depending on whether debtors exercised their option to extend the repayment period. Rickman was liable on the first mortgage on Ocala Downs prior to conveying it to debtors and did not alter that obligation in the July 11, 1989 agreement with debtors. Thus, Rickman remains liable on the first mortgage.

Rickman argues that the amount due to Central Florida Financial Services, Inc., must be deducted from the fair market value of Ocala Downs. *In re Bellman Farms, Inc.,* 86 B.R. 1016 (D.S.D.1988).

The Court agrees that a senior lien decreases the value of the estate's interest in property and consequently reduces the amount left to satisfy junior liens. However, Rickman does not account for his liability on the first mortgage obligation. Because Rickman agreed to pay this debt, a corresponding amount must be deducted from the value of his interest in Ocala Downs.

■ Finally, debtors argue that the note they gave Rickman was a purchase money mortgage for Ocala Downs and, as such, no deficiency judgment should be allowed. Debtors' contention is contrary to Florida law. Granting a deficiency judgment on a mortgage is within the discretion of the trial court, and denying a deficiency claim requires the Court to disclose the equitable considerations that dictate denial. *Lloyd v. Cannon,* 399 So.2d 1095 (Fla. 1st DCA 1981). Generally, a court should grant a deficiency claim and denial of such a claim is an exception to this general rule. *Id.* Additionally, the purchase money nature of a mortgage is just one factor the Court may consider in making a deficiency determination and it alone is insufficient reason to deny the award of a deficiency judgment. *Taylor v. Prine,* 101 Fla. 967, 132 So. 464 (1931).

In sum, the Court finds that Rickman is an oversecured creditor and is entitled to interest at the contract rate of twelve and one-half percent (12½%) per annum until November 18, 1991. The amount of allowable interest is $328,591.46. The first mortgage on Ocala Downs as of the petition date must be deducted from the estate's interest in the property, thus, the value of Ocala Downs is $972,818.83. The same amount must be deducted from the value of Rickman's interest in the property, the note amount of $1,201,410.20, because he remains liable on the mortgage obligation. Accordingly, the amount of Rickman's allowable secured claim is $228,-591.40.

**2.** In *Bonner v. Prichard,* 661 F.2d 1206 (11th Cir.1981) the Eleventh Circuit adopted as binding precedent the decisions of the Fifth Circuit prior to October 1, 1981.

*Claim 20*

Paragraph 3(g) of the July 14, 1989, agreement provides for remedies in the event of default. The agreement states in pertinent part as follows:

g. In the event of default by Argiannis to repurchase Parcel One and Parcel Two, Rickman may, at his option:

i. institute an action for specific performance;

ii. retain title to Parcel One and Parcel Two as liquidated damages;

iii. sell Parcel One and Parcel Two at public or private sale and apply the proceed[ ] first to the costs of sale (including commissions and reasonable attorney fees), secondly to the satisfaction of the One Million Eight Hundred Forty Thousand Dollars ($1,840,000.00) obligation, plus interest due Rickman, and the balance, if any, to Argiannis. In the event the proceeds of sale are not sufficient to satisfy said obligations. Rickman may obtain a judgment against Argiannis for the deficiency.

 Debtors argue that these are exclusive remedies so Rickman may not sue on the contract and collect damages. This assertion is contrary to the precatory language used in the contract. The contract says that Rickman "may" choose a remedy not that he "shall" choose or some other term that would indicate an exclusive remedy. In addition, debtors' contention is contrary to Florida law which allows a non-breaching party to waive its contract remedies and sue for specific enforcement or damages. *Chace v. Johnson,* 98 Fla. 118, 123 So. 519 (1929).

 Debtors also argue that Rickman elected to keep the Gilbert Corners property as liquidated damages pursuant to 3(g)(ii) because he failed to act on the breach by bringing suit or selling the property. This, too, is contrary to Florida law which requires decisive action to elect a remedy. *Armour & Co. v. Lambdin,* 154 Fla. 86, 16 So.2d 805 (1944). An effective election of remedies requires the choice be between inconsistent remedies. *Id.* Rickman's actions in dealing with the separate properties and his security interest in each were not inconsistent. The foreclosure of one property did not require choosing that remedy for all the others, because foreclosure would not be inconsistent with pursuing other available remedies in regard to the other properties. In addition, in a letter dated August 10, 1990, Rickman specifically informed debtors that he reserved the right to bring independent actions on the property. In a second demand letter to debtors dated November 12, 1990, Rickman informed debtors that he was not electing a remedy.

Because Florida law allows a non-breaching party to choose between specifically enforcing a contract or suing for damages, and requires more than inaction for an election of remedies, and because Rickman specifically informed debtors that he was not making an election, the unsecured claim should be allowed as filed.

Thus, the allowable amount of claim 20 is $1,019,153.06.

The Court will enter separate orders for claims 19 and 20 consistent with these findings of fact and conclusions of law.