## In re PHILLIP WATTS ENTERPRISES, INC., Debtor.

### Bankruptcy No. 93–04269.

United States Bankruptcy Court,
N.D. Florida,
Pensacola Division.

Aug. 23, 1995.

Tom Reed, Pensacola, FL, for debtor.

Roberta Colton, Tampa, FL, for Creditor DDRC.

### MEMORANDUM OPINION ON OBJECTION TO CLAIM

LEWIS M. KILLIAN, Jr., Bankruptcy Judge.

THIS MATTER is before the Court on debtor in possession's objection to claim number 33 filed by Developers Diversified Realty Corporation ("Developers Diversified"). A hearing was held on June 29, 1995, and upon the evidence presented, the following findings of fact and conclusions of law are entered pursuant to Bankruptcy Rule 7052.

## Findings of Fact

On March 29, 1993, the debtor in possession, Phillip Watts Enterprises, Inc. ("PW Enterprises"), filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.[1] On July 12, 1993, Developers Diversified filed an amended proof of claim in the amount of $54,154.11 for rent, rental tax, and common area maintenance fees ("CAM fees") under a commercial lease (the "Lease") between Developers Diversified and PW Enterprises. PW Enterprises objects to the portion of claim 33 which consists of charges for CAM fees and the tax thereon.

The Lease was entered into on January 28, 1972, between Grady and Corrie Barnes ("Barnes"), as lessors, and Barnes Store # 1, Inc. ("Barnes Store"), as lessee. John Sanford and Phillip Watts signed the Lease on behalf of Barnes Store, as President and Secretary, respectively. The Lease was for a term of ten years, beginning December 1, 1971, and ending November 30, 1981. The lessee, Barnes Store, had the option to extend the Lease for two, five-year terms. Barnes Store exercised both options, and the Lease was extended until November 30, 1991.

PW Enterprises purchased Barnes Store in 1986, and became the lessee under the Lease. Barnes assigned the Lease to Moreland Hills Development Company, which assigned the Lease to W & M Properties ("W & M"). In December 1991, W & M, as lessor, and Phillip Watts Enterprises, as lessee, signed an Extension and Modification of Lease ("Modification"). The Modification extended the Lease term "on a calendar month-to-month basis commencing December 1, 1991, and expiring on December 31, 1991." The term of the Lease would automatically renew unless either the lessor or lessee provided (30) days prior notice of termination to the other party. The Modification called for minimum rent of $3,009.47 per month and percentage rent in the amount of (15) percent of gross sales in excess of $300,000. All other terms of the Lease were to remain in force during the extension. On January 1, 1993, W & M assigned the lease to Developers Diversified, a real estate investment trust in which W & M is a limited partner.

From the inception of the Lease in 1972, the lessees, first Barnes Store and more recently PW Enterprises, maintained their proportionate share of the common area, including cleaning the front of the store, the sidewalks, and the parking area. In 1988, W & M, as lessor, took over the maintenance of common areas in the shopping center, including sweeping the parking lot on a daily basis and making repairs to the signs and parking lot, and began charging the tenants a pro rata share of the expenses. Developers Diversified continued this practice upon assignment of the Lease. PW Enterprises no longer maintained the common areas after the lessors assumed this responsibility. Neither W & M nor Developers Diversified discussed this practice with Phillip Watts, owner of PW Enterprises. W & M never billed PW Enterprises for these services and Developers Diversified did not send a bill until June 1992.[2] PW Enterprises objected to the charges and notified Developers Diversified that the bill would not be paid.

During the course of this chapter 11 case, PW Enterprises sent a letter, postmarked April 5, 1993, to Developers Diversified stating an intention to vacate on April 30, 1993. March of 1993 was the last month for which PW Enterprises paid rent. Both parties are in agreement that PW Enterprises owes rent and rental tax, for April and May of 1993, in the amount of $6,440.26. Therefore, the amount in dispute is $49,713.85, which consists of CAM fees and rental tax for the years 1988 through 1992.[3]

---

1. 11 U.S.C. §§ 101 et seq. (1995). For administrative convenience, all references to the Code will be by section and number.

2. The bill contained the following charges:

| Year | CAM Fees | Tax on CAM Fees | Total |
|------|----------|-----------------|-------|
| 1988 | $ 4,020.21 | $281.41 | $ 4,301.62 |
| 1989 | 10,593.43 | 741.54 | 11,334.97 |

| Year | CAM Fees | Tax on CAM Fees | Total |
|------|----------|-----------------|-------|
| 1990 | 13,215.59 | 925.09 | 14,140.68 |
| 1991 | 8,947.40 | 626.32 | 9,573.72 |
| | | | $39,350.99 |

3. The proof of claim contains fees for 1992 in the amount of $10,362.86. The claim consists of $9,684.92 for CAM fees, and $677.94 for the tax thereon.

## Conclusions of Law

The Bankruptcy Code discusses the allowance of claims in section 502. Section 502(a) provides that a claim filed pursuant to section 501 is deemed allowed unless a party in interest objects. Section 502(b) provides that if such an objection is made, the court, after notice and a hearing, will determine the amount of the claim. A properly filed claim constitutes prima facie evidence of the validity and amount of the claim. Fed.R.Bankr.P. 3001(f). "The objecting party must come forward with affirmative proof to rebut this presumption." *In re Argiannis*, 156 B.R. 683, 687 (Bkrtcy.M.D.Fla.1993).

Developers Diversified filed its claim number 33 on July 12, 1993, and PW Enterprises filed a written objection challenging the amount of the claim. At the hearing, PW Enterprises presented evidence to rebut the validity of the claim, and the burden of proof, therefore, shifted to Developers Diversified. The amount of Developers Diversified's claim must be determined pursuant to section 502(b). *Id.*

Developers Diversified contends that the terms of the Lease require PW Enterprises to pay a proportionate share of CAM fees. I find Developers Diversified's position to be unsupported. In Florida, the general rules of contract construction apply to the construction of a commercial lease contract. *Stemmler v. Moon Jewelry Co.*, 139 So.2d 150, 153 (Fla.App. 1 Dist.1962), *cert. denied*, 146 So.2d 375 (Fla.1962). "It is a cardinal rule of contract construction that the intention of the parties governs." *Dune I, Inc. v. Palms North Owners Ass'n, Inc.*, 605 So.2d 903, 905 (Fla.App. 1 Dist.1992). The intention of parties to a contract is to be obtained from the unambiguous terms of the contract. *Sisco v. Rotenberg*, 104 So.2d 365 (Fla.1958). Under Florida law, "if a contract is unambiguous, the actual language used in the contract is the best evidence of the intent of the parties, and the contract terms will be given their plain meaning." *Rey v. Guy Gannett Publishing Co.*, 766 F.Supp. 1142, 1146 (S.D.Fla.1991); *Institutional & Supermarket Equip., Inc. v. C & S Refrigeration, Inc.*, 609 So.2d 66, 68 (Fla.App. 4 Dist.1992) ("Where contracts are clear and unambiguous, they should be construed as written, and the court can give it no other meaning.").

I find that the Lease is clear and unambiguous with respect to common area maintenance. Paragraph 5 of the Lease provides in part:

> *Lessors shall be responsible for all exterior maintenance* and structural maintenance (which term shall include the roof of the building), however it is understood that the *maintenance for the parking lot and maintenance for the outside signs is the responsibility of the Lessee* and the Lessors specifically exclude maintenance in connection with said signs and parking lot (emphasis added).

Paragraph 6 further describes the responsibility of the parties:

> Lessee shall be responsible for the maintenance of the heating and air conditioning systems and all other maintenance not specifically made a responsibility of Lessors in paragraph 5.

Paragraph 13 is clear regarding common area maintenance, and it provides:

> Other than the maintenance responsibility set forth hereinbefore on the part of Lessors, Lessee shall otherwise *maintain and keep up including maintaining the proportionate share of the common parking area* (emphasis added).

The Lease requires PW Enterprises to "keep up" and "maintain" a proportionate share of the common parking area and outside signs. The term maintain is defined as "acts of repairs and other acts to prevent a decline, lapse or cessation from existing state or condition." Black's Law Dictionary 859 (5th ed. 1979). Further, maintenance is defined as the "upkeep, or preserving the condition of property to be operated." *Id.* These definitions are consistent with the provisions of the Lease. Thus, with respect to the common areas, the Lease requires PW Enterprises to keep a proportionate share of the common parking area clean and in a good state of repair, and to keep up its signs.

However, there is no provision in the Lease which requires PW Enterprises to *pay* a proportionate share of the expenses in-

curred by Developers Diversified for common area maintenance, and this was never discussed with PW Enterprises. Moreover, the Lease plainly provides that Developers Diversified is responsible for all "exterior maintenance." In addition to charges for parking lot and sign maintenance, the claim contains charges for such services as landscaping, exterior light bulbs, "outside services," and other similar items. It is clear that these services are not required of PW Enterprises by the Lease. I conclude such services are the responsibility of Developers Diversified, fitting under the umbrella of "exterior maintenance." Thus, PW Enterprises is not required to pay for any share of those services required of the lessor under the Lease.

For PW Enterprises to be responsible for payment for a share of those services which it is required to provide, Developers Diversified would have had to perform the maintenance in response to a breach by PW Enterprises. However, I find that Developers Diversified has neither alleged nor provided evidence to prove that PW Enterprises breached any of its responsibilities under the Lease. Under Florida law, if PW Enterprises had breached its covenant to maintain, Developers Diversified would be able to recover the costs incurred in completing its performance. *Cf. Jackson v. Riley,* 427 So.2d 255, 256 (Fla.App. 5 Dist.1983) (finding reasonable and necessary expenses incurred in part performance of a contract as the proper measure of damages where a contractor failed to complete performance of a construction contract). However, the evidence establishes that PW Enterprises maintained and kept up its proportionate share of the common parking area and signs until W. & M, and later Developers Diversified, unilaterally undertook responsibility for providing such maintenance. PW Enterprises did not breach the terms of the lease regarding common area maintenance because Developers Diversified never gave them the chance. Thus, there is no justification for allowing Developers Diversified to commandeer duties being adequately performed by PW Enterprises and bill PW Enterprises for the cost of such performance.

In summary, the Lease requires PW Enterprises to maintain its signs and a proportionate share of the common parking area. It does not provide that PW Enterprises is responsible for paying a proportionate share of CAM fees for services provided by Developers Diversified. Further, Developers Diversified has not alleged, and the evidence presented does not prove, that PW Enterprises breached the terms of the Lease, thereby allowing Developers Diversified to maintain the common area and bill PW Enterprises for these services. Thus, PW Enterprises is not required to pay the CAM fees nor the tax thereon.

 The outcome would have been the same if the court had determined that the Lease was ambiguous with respect to common area maintenance. If the terms of a contract are ambiguous a court may consider extrinsic evidence to clarify or elucidate the ambiguous language. *Vienneau v. Metropolitan Life Ins. Co.,* 548 So.2d 856, 859 (Fla. App. 4 Dist.1989). The major types of extrinsic evidence to be considered when construing ambiguous contracts are course of dealing, the interpretation placed on the contract by the parties, and usage of trade. *Id.* (considering parties interpretation of a contract and course of dealing between parties where the contract is ambiguous); Fla.Stat. Ann. § 671.205 (West 1993) (allowing the consideration of course of dealing and usage of trade in the interpretation of ambiguous contracts).

 "A 'course of dealing' is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Fla.Stat.Ann. § 671.205(1). Developers Diversified succeeded W & M's rights in the Lease on January 1, 1993, and has not billed PW Enterprises for CAM fees covering this time period. As a result, there is no relevant course of dealing between Developers Diversified and PW Enterprises. When construing ambiguous contracts, courts may "consider the interpretation placed on the contract by the parties, as long as such interpretation is not completely at variance with the principles of correct legal interpretation of the

**740**

contract provisions." *Vienneau,* 548 So.2d at 859. The Lease covers a period of more than twenty years. Phillip Watts has been a party to the Lease for the entire period, first as Secretary of Barnes Store and then as owner of PW Enterprises. From 1972 until 1988, the lessees maintained the common parking area. In 1988 the lessors (first W & M and then Developers Diversified) took over the maintenance of the common areas without consulting PW Enterprises, and did not bill for these services until 1992. Over the term of the Lease there have been four lessors and two lessees, and prior to 1992, not once has a lessor billed, or a lessee paid, for CAM fees under the terms of this Lease. Thus, every party to the Lease, prior to 1992, has interpreted the Lease as requiring the lessee to maintain, not pay the lessor to maintain, a proportionate share of the common area.

██ A "usage of trade" is defined as "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." Fla.Stat.Ann. § 671.205(2). "Most shopping center leases provide that the tenant *pay* its proportionate share of the maintenance of the common areas." *Drafting Shopping Center Leases,* 1967 A.B.A.Sec. Real Prop., Prob. and Trust, *reprinted in Commercial Real Estate Leases,* Pract.Law Inst. 453 (1995) (emphasis added). Testimony about Developers Diversified's business practices provided support to this statement, as leases between Developers Diversified and tenants at the same shopping center contain specific provisions requiring the tenants to pay a proportionate share of CAM fees. There is not a provision in the Lease requiring PW Enterprises to pay its proportionate share of CAM fees. The absence of such a provision is evidence of an intention to exclude it. *Stemmler,* 139 So.2d at 153.

Thus, even if the terms of the Lease concerning common area maintenance were deemed ambiguous, the outcome of this contested matter would remain the same. The usage of trade and the interpretation placed on the Lease by the various parties to it clearly indicate that the Lease does not require the lessee to pay CAM fees to the lessor. As a result, PW Enterprises would not be required to pay CAM fees to Developers Diversified under the terms of the Lease.

██ Developers Diversified next asserts that if the Lease does not require PW Enterprises to pay its share of CAM fees, then its claim should be allowed under the theory of unjust enrichment. Under this theory, a contract is implied in law, on the grounds of equity and justice, to prevent unjust enrichment. 11 Fla.Jur.2d *Contracts* § 236 (1979). "[C]ontracts implied in law do not rest upon assent of the parties; they are based primarily upon a benefit flowing to the person sought to be charged." *Id.* The essential elements of a cause of action for unjust enrichment are: (1) a benefit has been conferred upon an entity, who has knowledge thereof; (2) the entity voluntarily accepts and retains the benefit conferred; and (3) under such circumstances that it would be inequitable for the entity to retain the benefit without paying the value thereof. *Hillman Construction Corp. v. Wainer,* 636 So.2d 576, 577 (Fla.App. 4 Dist.1994). It seems likely that the facts of this case would meet the above elements, at least for some of the fees charged. However, Florida courts have consistently held that the law will not imply a contract where a valid written contract exists dealing with the same subject. *Hazen v. Cobb,* 96 Fla. 151, 165, 117 So. 853 (Fla.1928); *Harding Realty, Inc. v. Turnberry Towers Corp.,* 436 So.2d 983, 984 (Fla.App. 3 Dist. 1983); *Dick Winning Chrysler–Plymouth of Ft. Myers, Inc. v. Chrysler Motors Corp.,* 750 F.2d 895, 900 (11th Cir.1985). Since the relationship here is based on a valid written contract, Developers Diversified's claim cannot be allowed under a theory of unjust enrichment.

**Conclusion**

Based on the foregoing, the objection to claim number 33 of Developers Diversified shall be granted in part and denied in part. The claim shall be allowed in the amount of $6440.26, representing rent and rental tax for the months of April and May, 1993. A sepa-

rate order shall be entered in accordance herewith.